UNITED STATES of America ex rel.
Joseph MARZENO, Appellant,

v.

Louis GENGLER, Warden, Federal House
of Detention, Appellee.

Nos. 77–1254, 77–1360.

United States Court of Appeals,
Third Circuit.

Argued Oct. 4, 1977.

Decided Feb. 27, 1978.

Roger A. Lowenstein, Federal Public Defender, for appellant.

Jonathan L. Goldstein, Asst. U. S. Atty., Ralph A. Jacobs, U. S. Atty., Newark, N. J., for appellee.

Before SEITZ, Chief Judge, and BIGGS and HUNTER, Circuit Judges.

## OPINION

JAMES HUNTER, III, Circuit Judge:

In this appeal, this Court is once again confronted with the application of *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), to a prosecutor's failure to disclose information potentially helpful to a criminal defendant.[1] The district court denied Marzeno's motion under 28 U.S.C. § 2255 on the ground that the undisclosed information would not have affected the jury's judgment in the prisoner's 1973 criminal case. After our review of the evidence presented at trial in conjunction with the information adduced at the section 2255 evidentiary hearing, we hold that the undisclosed information is not "material" under

1. This court first considered the application of Agurs in *United States v. McCrane*, 527 F.2d 906 (1975), *vacated and remanded for reconsid-* *eration in light of United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), on remand, 547 F.2d 204 (3d Cir. 1976).

*Agurs*, and thus affirm the denial of the motion.

## I

The prisoner was convicted on several counts of an eight count indictment, which stemmed from his alleged involvement in counterfeiting matters in 1971. He was tried along with three co-defendants in the District of New Jersey before Judge William W. Knox, visiting judge from the Western District of Pennsylvania, and a jury. On appeal, his conviction was affirmed by this court in a judgment order on January 18, 1974. *United States v. Marzeno*, 491 F.2d 751 (3d Cir. 1974). Marzeno brought this section 2255 motion on February 20, 1975. After an evidentiary hearing was held, Judge Meanor denied the motion in an opinion dated January 4, 1977.

Marzeno alleges three different violations of his right to a fair trial on the counterfeiting violations, all directed at alleged prosecutorial misconduct in failing to reveal information that would have impeached the credibility of the government's informant-witness, Joseph Bogdanski. Marzeno alleges that the failure to reveal the information prior to trial or when requested by defense counsel during trial violated rights enunciated in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The three nondisclosures related to

1) Bogdanski's participation in an Irvington, New Jersey incident in which he was investigated for allegedly passing a counterfeit bill, which later was shown to have the same serial number as one of the bills which formed the basis of the prosecution against Marzeno;

2) The intercession by a Secret Service agent, on behalf of Bogdanski, in a pending state criminal proceeding against Bogdanski in Delaware; and

3) Certain elements of Bogdanski's prior criminal record, which were not brought out by the prosecution at trial.

## II

In this appeal, we are asked to review the claims of Marzeno as to the sentences he received upon conviction under Count I of the indictment (conspiracy to possess and utter counterfeit currency) and Count VI (transfer of approximately $95,000 of counterfeit currency on June 29, 1971).[2]

Bogdanski's role in the investigation leading to Marzeno's arrest and at trial is critical to Marzeno's allegations of a denial of his due process right to a fair trial. Bogdanski participated in the investigation and prosecution of Marzeno and his co-defendants as an undercover informant, engaging in transactions in which counterfeit bills were passed, and reporting to Secret Service agents investigating the counterfeiting ring. He related at trial that his motivation for informing and testifying against Marzeno, who formerly had been a friend, was that he had developed a grudge against Marzeno and was willing to cooperate with federal authorities in order to exact his revenge.

Since Bogdanski's credibility has been called into question, we examine first the relevant facts of the case apart from the testimony given by Bogdanski.

On June 29, 1971, Bogdanski called Marzeno to set up a meeting for that night.[3]

---

**2.** He was sentenced to seven years for the transfer of approximately $95,000 in counterfeit currency (Count VI of the indictment), to be served consecutively to his two year sentence for conspiring to possess and utter counterfeit bills (Count I). Marzeno was convicted at this trial of three other counts of transferring counterfeit currency. Sentence was suspended as to each of these counts.

**3.** The substance of the call, at first glance, seems to relate to Marzeno's proposed sale of

his home. However, the purpose of the call—to set up a meeting between Marzeno and Bogdanski concerning a "buyer" Bogdanski had located—lends itself to the inference that the transaction intended was not so innocent as the sale of a house. For example, part of the conversation was as follows:

Bogdanski: I talked to the guy.
Marzeno: Yeah? Watch it.
Bogdanski: So how about tonight? Can I see you some place tonight?

The call was recorded by the Secret Service. After the meeting was arranged, Special Agent Cavicchia of the Secret Service and other agents thoroughly searched Bogdanski's person and his car. Under surveillance by other Secret Service agents, Cavicchia traveled with Bogdanski to Marzeno's home. Cavicchia was to masquerade as the ultimate buyer of the counterfeits, with Bogdanski serving as the middleman. Bogdanski alone went into Marzeno's home, while Cavicchia remained in the car. After a short period of time, Bogdanski left the house and drove with Cavicchia to a restaurant in Maplewood, N. J. There Bogdanski met with Marzeno, away from Cavicchia. Marzeno and Bogdanski then left the restaurant in separate cars. The two were absent from the restaurant for approximately thirty minutes, and were not under surveillance. When they returned in Bogdanski's car, Bogdanski told Cavicchia that he refused to proceed with "the deal" because he felt that there was no surveillance, as had been originally planned. He also told Cavicchia the general destination of Marzeno, which was the 300 block of Sanford Avenue in Newark. After a short time at the restaurant, Marzeno and Bogdanski left again, in Bogdanski's car. At this time, there was Secret Service surveillance in the area of Newark mentioned by Bogdanski. The agents saw Bogdanski's car pull up at 379 Sanford Avenue. Marzeno got out of the car, entered the building, and was seen leaving the building carrying a small, "airline-type" bag. Marzeno got into the car with Bogdanski and the two left the location. From the time Bogdanski and Marzeno left the Sanford Avenue pickup point, the Secret Service failed to maintain surveillance on the car.

Bogdanski returned to the restaurant alone. Cavicchia inspected the bag, which contained the counterfeit bills.[4]

The gaps in the Secret Service agents' testimony and surveillance included 1) the period when Bogdanski alone entered Marzeno's home; 2) the times Bogdanski and Marzeno left the Maplewood restaurant apparently headed towards Sanford Avenue in Newark; and 3) from the time Marzeno and Bogdanski left 379 Sanford Avenue until Bogdanski reappeared at the Maplewood restaurant with the bag in his car.

### III

At trial, Bogdanski served as a government witness. On direct, he testified that he had received money from the Secret Service for his role in the investigation. He was questioned by the government, but not cross-examined, about his prior convictions, revealing four felonies on his record. Although it was later adduced at the § 2255 hearing, at trial Bogdanski did not mention that Agent Cavicchia had traveled to Delaware during the pendency of state criminal proceedings against Bogdanski to discuss with state authorities the assistance rendered by the informant.

He further asserted that his first contact with the Secret Service was in February 1971, when he called to report his knowledge of Marzeno's counterfeiting activities (arising from an offer by Marzeno the previous month to sell counterfeit currency to Bogdanski). On cross examination, Bogdanski was questioned as follows:

Q. How did you happen to know to call Mr. Pete Cavicchia of the Secret Service?

A. I called up the Secret Service.

Marzeno: Yes. Why don't you see me now? No good?

Bogdanski: Well, I will be going home anyway. I just got out of work.

Marzeno: Does he want to just talk, or what?

Bogdanski: Because—

Marzeno: Is he looking to talk or is he looking to buy the house?

Bogdanski: He will buy the house. He wants to buy the house.

Marzeno: He wants to buy the house?

Bogdanski: Right.

Marzeno: He can make a deposit tonight if he wants to.

Bogdanski: Yes.

Marzeno: All right?

Bogdanski: All right.

4. One of the agents testifying at the trial noted that the bag Cavicchia inspected appeared to be the same bag Marzeno carried out of the building at 379 Sanford Avenue.

Q. And just said, "I want to speak to somebody about counterfeit money."

A. Right.

Q. You never had any contact with the Secret Service before that?

A. None.

Q. Between the middle of January, 1971, and the middle of February, 1971?

A. No.

Q. You weren't by any chance apprehended by them for distributing counterfeit money, were you, sir?

A. I was not.

Q. You were not?

A. No.

Q. You weren't under any investigation by them?

A. None that I know of, no.

Later, however, Bogdanski responded to a question asked by defense counsel by referring to a conversation he had in February 1971 with Agent Cavicchia about a $100 bill that he had in his possession.

On redirect, the prosecutor pursued the incident broached by Bogdanski. The witness indicated that Agent Cavicchia had questioned him about a bill approximately two weeks prior to Bogdanski's calling the Secret Service about Marzeno. Bogdanski stated that he had cooperated fully with the Secret Service and that the bill was determined not to be counterfeit.

Later, during the trial, Agent Cavicchia testified and corroborated Bogdanski's sto-ry. He stated "it was determined that the subject bill was allegedly genuine." Cavicchia did not mention his trip to Delaware on Bogdanski's behalf. After Cavicchia testified, defense counsel requested, pursuant to the Jencks Act,[5] the report prepared by the Irvington police concerning the incident. The Irvington report was contained in the files of the Secret Service, which were being used by the government for trial preparation.

The prosecution did not hand over the report. Since the defense request was phrased in terms of the Jencks Act, apparently the prosecution felt no obligation to turn over the Irvington report which did not contain material falling within the narrow category of "Jencks Act" information.[6] The defense attorneys made no request for the document specifying the *Brady* rule as the basis for disclosure.

The police report's relevance to Marzeno's § 2255 motion related to Bogdanski's credibility on the witness stand. In investigating Bogdanski's role in the matter, an Irvington policeman recorded the serial number of the bill. That number, it was discovered when Marzeno obtained the report after trial, matched the serial number on one of the bills on which Marzeno's prosecution was based.[7] This bill was a part of Count IV of the indictment, on which Marzeno was acquitted. Coupled with the evidence of Bogdanski's conduct when he attempted

5. 18 U.S.C. § 3500 *et seq.*

6. The following colloquy among Mr. Kallmann, the prosecutor, Messrs. Hermann and Glavin, defense counsel, and the court reflects the confusion about what information was being requested and the extent of the prosecution's duty to disclose.

MR. KALLMANN: . . . . First of all, there is no such report. The Secret Service never did write up anything because it was determined immediately that there was no prosecutable or investigatable case at that point, and I have been so advised by the Secret Service agents. So there is nothing to provide to the defendant.

THE COURT: Well, this does not only refer to cross examination. In Mr. Cavicchia's direct examination, he referred that he had first spoken to him.

MR. HERMANN: In other words, this investigation that took place in Irvington, there is no report whatsoever?

MR. KALLMANN: No Secret Service report.

THE COURT: Don't ask me.

MR. GLAVIN: Not necessarily on the government Secret Service report.

THE COURT: I can't make the government produce something they say does not exist. The best I can tell you is to call Cavicchia in and ask him.

MR. KALLMANN: There is no report by any Secret Service agent.

7. The bill used by the prosecution having the same number as the "Irvington" bill was one of those found by state authorities in connection with a state criminal investigation during a search pursuant to a warrant of Marzeno's home on March 26.

to pay for goods with the bill in question,[8] the identity of serial numbers permits the inference that Bogdanski was involved with counterfeiting prior to his first contacts with the Secret Service.[9] This inference, if accepted, would contradict Bogdanski's testimony at trial.

Marzeno alleges that it was not until after trial that he was able to uncover the information complained of here. He then instituted this section 2255 action, alleging that the prosecution's nondisclosures violated his right to a fair trial.

## IV

■ The rule of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1967), is as follows:

the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.

*Id.* at 87, 83 S.Ct. at 1196. The prosecutor is charged with knowledge of the significance of evidence in his file, "even if he has actually overlooked it." *United States v. Agurs, supra,* 427 U.S. at 110, 96 S.Ct. at 2400. Further, the rule in *Brady* has been expanded to cover situations in which no request has been made by the defendant for items of exculpatory evidence. Rather, in some cases certain evidence may be of such probative value as to require the prosecutor to reveal it to the defendant absent any demand for it.

■ In this case, the evidence not disclosed to Marzeno related to the credibility of Bogdanski on the witness stand. Evidence impeaching the testimony of a government witness falls within the *Brady* rule when the reliability of the witness may be determinative of a criminal defendant's guilt or innocence. *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *United States v. Dansker,* 565 F.2d 1262 (3d Cir. 1977) *cert. dismissed* by —— U.S. ——, 98 S.Ct. 905, 54 L.Ed.2d 805 (1978); *United States v. McCrane,* 547 F.2d 204 (3d Cir. 1976). *See Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959).

■ Nevertheless, a finding by the reviewing court that the evidence is exculpatory in nature does not end the inquiry. A conviction need not be vacated because evidence that is "merely repetitious" or "cumulative" has not been revealed to the defendant. *Giles v. Maryland,* 386 U.S. 66, 98, 87 S.Ct. 793, 17 L.Ed.2d 737 (Fortas, J. concurring). *See United States v. Dansker, supra.* Once evidence is found to be exculpatory, the question then focuses on whether the omitted evidence was material to the finding of guilt in the original criminal trial.

■ The Supreme Court's decision in *United States v. Agurs, supra,* addressed the often perplexing problem of what information is "material" to the adversarial process in a specific criminal case. In analyzing the prior cases litigated before it concerning the prosecution's disclosure duty, the Court extracted three discrete factual situations in which suppressed evidence might be analyzed for its materiality. The first involves the situation in which a prosecution witness has given perjurious testimony and the prosecution knew or should have known of the falsity of the

---

**8.** When the storekeeper checked the bill and found it to be counterfeit, Bogdanski took the bill and left the store hurriedly. He then left the area on foot, leaving behind the car which he had driven to the store. Later, Bogdanski took the bill to his bank, where the teller took the bill, initialed it, and sent it on to the Secret Service. Apparently the bill was later destroyed by the Secret Service since the Service determined that there was no basis for prosecuting Bogdanski and the origin of the bill prior to Bogdanski was unknown.

**9.** The trial judge in his opinion denying the section 2255 motion, specifically concluded that Bogdanski's role in the Irvington incident indicated that he had knowledge of counterfeiting. Further, the court found that Bogdanski had the means by which to frame Marzeno, that is, an independent source of counterfeit currency.

statements.[10]  In such cases, which might involve "a corruption of the truth-seeking function of the trial process," 427 U.S. at 104, 96 S.Ct. at 2397, the undisclosed information is material if "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Id.* at 103, 96 S.Ct. at 2397.

The second problematic situation, typified by the *Brady* case, arises when the defendant has made a specific request for information and the prosecution has failed to respond by revealing the requested information to the defendant.  In such cases, the *Agurs* court noted, "[w]hen the prosecutor receives a specific and relevant request, the failure to make any response is seldom, if ever, excusable."  427 U.S. at 106, 96 S.Ct. at 2399.  In determining the materiality of a specific request, a reviewing court must determine whether "the suppressed evidence might have affected the outcome of the trial."  *Id.* at 104, 96 S.Ct. at 2398.  *See Government of the Virgin Islands v. Testamark,* 570 F.2d 1162, No. 77–1567 (3d Cir. Jan. 10, 1978).

Third, when no request is made by the defendant or only a general request is made, information not revealed by the prosecutor will be held to be material only if "the omitted evidence creates a reasonable doubt that did not otherwise exist." *United States v. Agurs, supra,* 427 U.S. at 112, 96 S.Ct. at 2401.  *See United States v. McCrane, supra.*

■  The standards of "materiality" outlined in *Agurs* of course do not admit to precise application.  Necessarily, a nondisclosure in a particular case must be viewed in light of what evidence was adduced at trial.  In some instances, relatively minor facts that are withheld from a defendant may be enough to justify vacating a conviction, if the undisclosed information directly casts doubt on the evidence presented to the jury and on which the jury relied in its finding of guilt.  *See United States v. McCrane, supra,* 547 F.2d at 206.  On the other hand, unrevealed evidence which by itself might seem more exculpatory than that justifying a new trial in another case may nevertheless not be considered material in a case where other evidence before the jury removes any doubts about the question of guilt.[11]  Consequently, the standards of materiality outlined in *Agurs* cannot be applied in a vacuum, but must be understood in terms of the total record in a particular case.

■  In reviewing the record, we find that Marzeno did not request the records of Bogdanski's prior convictions or for any information relating to prosecutorial favoritism towards the witness, which would have revealed Agent Cavicchia's intercession on Bogdanski's behalf in Delaware.  As to the failure to reveal the Irvington police report, we find that the government and the defense were confused as to the information sought.  The government flatly denied the existence of a Secret Service report, but it seems that the defense attorney attempted to broaden his request.  See note 6, *supra.*  Whether or not a request for the local police report on the incident was made is unclear.  The colloquy between the prosecutor and defense attorneys tapered off into suggestions about how defendants could obtain the information they sought.  Thus, in light of this uncertainty, we hold that the materiality of this evidence must be examined under the *Agurs* "specific request" standard.

■  A further problem, not addressed by the *Agurs* Court, arises when a reviewing court must determine whether a fair trial has been denied when multiple nondisclosures are alleged.  Certainly, the effect

---

10.  *See, Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); *Mooney v. Holohan,* 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935).

11.  The Court in *Agurs* stated:

> The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt.  .  .  .  This means that the omission must be evaluated in the context of the entire record.

427 U.S. at 112, 96 S.Ct. at 2401.  (footnotes omitted).

of each nondisclosure must not only be considered alone, for the cumulative effect of the nondisclosures might require reversal even though, standing alone, each bit of omitted evidence may not be sufficiently "material" to justify a new trial. A more difficult question under the *Agurs* decision is which standard should the reviewing court apply in determining the cumulative materiality of several nondisclosures when, as here, a specific request was made for one piece of evidence (the police report) and no requests were made for other (Bogdanski's convictions and evidence of prosecutorial favoritism towards the witness). We need not resolve this question here. We find that even if all the evidence is considered under the more strict, specific request standard, the undisclosed evidence was not material to the jury's finding of Marzeno's guilt.

### V

Marzeno's three contentions relating to the impeachment of Bogdanski are raised as follows. First, he contends that had the prosecution produced the Irvington police report, the information would have had a strong impact on the jury's assessment of Bogdanski's credibility. His argument is that if the jury had known of the identity of serial numbers between the bill Bogdanski tried to pass in Irvington and the one found in Marzeno's home, it could have inferred that Bogdanski's story of joining Marzeno only to gather information for the Secret Service was false. The jury might be led to discredit all Bogdanski's testimony a) because he had the means as well as the favored position as an informant to "frame" Marzeno; or b) because Bogdanski, contrary to his testimony, had been involved in the counterfeiting scheme before the Irvington incident, and thus his testimony was an attempt on his part to avoid prosecution.

The undisclosed evidence raises questions about Bogdanski's knowledge and participation in counterfeiting matters that were not placed before the jury for resolution of the witness' credibility.

Secondly, Marzeno asserts that the prosecution's failure to reveal that Agent Cavicchia had discussed Bogdanski's assistance as an informant with Delaware authorities at the time when Bogdanski faced criminal charges in that state is similar to the prosecutorial nondisclosure found to violate due process in *United States v. McCrane, supra.* In *McCrane,* the failure of the prosecution to reveal letters of recommendation written by the U. S. Attorney on behalf of the government's witness was held sufficient to justify vacating defendant's conviction because the witness' testimony was "the slender reed" on which the case against the defendant rested. As in *McCrane,* no evidence was presented of any agreement between Bogdanski and the Secret Service or of any understanding on the part of the witness that his cooperation would be rewarded by preferential treatment.

Had evidence of Cavicchia's intercession been available to the jury, the inference could be made that Bogdanski's testimony was colored by his awareness of Cavicchia's actions on his behalf. Evidence of preferential treatment is admissible for the purposes of impeachment,[12] and thus *if material,* the failure to reveal Cavicchia's actions to the defense would violate Marzeno's right to a fair trial.

Marzeno's third point is that the prosecutor failed to elicit three felony convictions on Bogdanski's record when, on direct, he questioned the witness on four other felony convictions. The three unrevealed convictions were 1) a 1941 burglary conviction; 2) a 1943 conviction for attempted breaking and entering; and 3) a 1949 burglary conviction.

Our task with respect to the evidence in this case is to assess whether the omitted evidence might have changed the outcome of the trial. In doing so, it is possible to evaluate the effect of the independent evidence against Marzeno without accepting

**12.** *See United States v. McCrane, supra; United States v. Harris,* 498 F.2d 1164 (3d Cir. 1974); *United States v. Newman,* 490 F.2d 139 (3d Cir. 1974).

what Bogdanski stated while on the witness stand.

Initially, we note that the failure to reveal the prior convictions, considered alone or in conjunction with the other nondisclosures alleged, does not rise to the level of reversible error. The unrevealed convictions are merely cumulative as to the issue of Bogdanski's credibility. *See United States v. Dansker, supra.* It is unreasonable to speculate that the jury could be led to doubt Bogdanski's veracity any more because of the three remote convictions, when the more recent four convictions had been placed in evidence.[13] Thus we find no violation of due process in this omission, and find no added probative value of these convictions in the jury's assessment of Bogdanski's credibility.

With respect to the other claims raised, we turn first to the evidence presented as to Count VI of the indictment, the transfer of $94,800 in counterfeit currency on June 29, 1971. Absent Bogdanski's testimony, the evidence presented through the Secret Service agents establishes that Marzeno and Bogdanski were under surveillance throughout most of the night in question. If Bogdanski were to "frame" Marzeno, the time in which he could effect the frame was limited to the periods of time when he and Marzeno left the Maplewood restaurant for the Newark address and when he and Marzeno left that address in Newark to return to Maplewood. Since Bogdanski and his car were searched thoroughly before meeting Marzeno, Bogdanski further would have had to cache the counterfeit money somewhere accessible to the route between Maplewood and Newark. There is no indication, however, that Bogdanski could have known of the specific Newark destination of Marzeno when the two met in Maplewood. Further, there is no indication that Bogdanski could have made a significant deviation from the Maplewood to Newark route in order to acquire counterfeit bills and use them to frame Marzeno.

The Secret Service agents testified to the surveillance of Bogdanski at all other times during the transaction. Further, this independent testimony fixes Marzeno as walking out of the Sanford Avenue building with an airline-type bag, which was later revealed to contain the counterfeit bills. This evidence supports the district judge's findings that "any doubt about Marzeno's guilt [would be] unreasonable and speculative" and that "[t]here simply is no way Bogdanski could have framed Marzeno on June 29, 1971." *United States ex rel. Marzeno v. Gengler,* No. 75–297 (D. N.J. Jan. 4, 1977), *reprinted* in Appellant's app. at 19.

Thus, given this independent evidence apart from the testimony of Bogdanski, we find that the evidence impugning Bogdanski's credibility would not have "affected the outcome of the trial."[14] *United States v. Agurs, supra* at 104, 96 S.Ct. at 2398. We therefore hold that the failure to hand over the Irvington police report was not "material" to Marzeno's conviction on this count of the indictment.

Turning to Count I, the conspiracy charge, we find under the same analysis that the omitted evidence of the police report was not material.[15]

Thus, we find that the Secret Service testimony on the events of June 29, 1971 left no reasonable doubt as to Marzeno's guilty participation in passing the counterfeit currency. Consequently, the convictions on which Marzeno was sentenced shall not be disturbed.

13. Further, it is questionable whether the unrevealed convictions because of their age, could be admitted in a new trial if granted. See Fed.R.Evid. 609(b).

14. From our analysis of the record in this case, there was no reasonable basis shown for discrediting the Secret Service agents' testimony. Nor has Marzeno presented us with any basis on this appeal.

15. Indeed, as to the conspiracy count, Bogdanski's testimony is neutral. The evidence of an agreement was presented almost entirely through Secret Service testimony of surveillance of the conspirators. Thus, as to the conspiracy count, Bogdanski's testimony was immaterial to the prosecution's case. Evidence impeaching him cannot therefore be considered material as to Marzeno's guilt or innocence of the conspiracy charge.

The judgment of the district court denying the section 2255 motion will be affirmed.

The "appeal" at our No. 77–1254 will be dismissed for want of appealability, the notice of appeal in that case having been filed from an opinion only.

SEITZ, Chief Judge, concurring.

I concur in the opinion of the court because I believe *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) so dictates. I write to express a concern arising primarily from the failure of the prosecution to timely disclose the fact that a secret service agent had theretofore interceded on behalf of the prosecution witness, Bogdanski, in a pending state criminal prosecution. Such information was clearly relevant to the jury's credibility evaluation of Bogdanski.

If at all possible, a defendant and the courts should not be required to confront the issues here involved in the context of a § 2255 proceeding wherein the defendant bears the burden of demonstrating that the omitted evidence creates a reasonable doubt that did not otherwise exist. In my view, a prosecutor's timely disclosure obligation with respect to this type of material cannot be overemphasized if due process is to be afforded a defendant at the trial. A post trial resolution of such an issue by the district court unnecessarily and needlessly requires the court to impinge on a function which should have been performed by the fact-finder at the trial.