UNITED STATES, Appellee,

v.

Franklin J. BRICKEY, Specialist Four,
U.S. Army, Appellant.

No. 39,248.

SPCM 13754.

U. S. Court of Military Appeals.

Sept. 6, 1983.

For Appellant: *Charles E. Brant*, Esquire (argued); *Colonel Edward S. Adamkewicz, Jr., Lieutenant Colonel John F. Lymburner, Major Grifton E. Carden, Captain Melvin Abercrombie* (on brief).

For Appellee: *Captain Lawrence W. Fitting* (argued); *Colonel R.R. Boller, Major Ted B. Borek, Major Robert B. Williams* (on brief); *Captain John P. Galligan.*

## Opinion of the Court

EVERETT, Chief Judge:

Contrary to his pleas, appellant was convicted by a special court-martial convened in Korea of having possessed and transferred methamphetamines on January 28, 1978, and of having attempted to possess and to sell methamphetamines on February 4, 1978, in violation of Articles 92 and 80, Uniform Code of Military Justice, 10 U.S.C. §§ 892 and 880, respectively.[1] These findings—as well as his sentence to a bad-conduct discharge—were approved by the convening authority and affirmed by the United States Army Court of Military Review. 8 M.J. 757 (1980).

We granted review out of concern for the conduct of trial counsel in withholding from the defense certain information impacting upon both the credibility and the competence of a key prosecution witness to the offenses charged.[2] After careful examination of the record and full consideration of the well-argued positions of the parties, we conclude that it was improper for trial counsel not to divulge this information and that the failure of trial counsel to bring this information to the attention of opposing counsel prejudiced appellant's defense.[3] Reversal of the convictions is therefore required.[4]

### I

Private Timothy Brown was the soldier to whom appellant allegedly transferred methamphetamines on January 28, 1978, when no one else was present. While Brown operated generally under the tutelage of agents of the Army's Criminal Investigation Division (CID), he did not do so pursuant to specific direction. He had introduced Brickey to an undercover agent on February 3, 1978, which led to the subsequent attempted possession and sale of methamphetamines on February 4.

On February 17, 1978, prior to referral of the charges against appellant, Brown was routinely reassigned to Fort Lewis, Washington, from Korea, where the offenses allegedly had occurred. Sometime in May 1978, someone—the record does not indicate who—requested that the Fort Lewis CID office conduct a polygraph examination of Brown. However, on May 12, that office sent this message to the Seoul CID office:

> 1. On 8 May 78 PV2 Brown was admitted to the emergency room, MAMC, suf-

---

1. The attempts were found as lesser included offenses of the alleged possession and sale of methamphetamines on February 4, 1978, Brickey also was charged with—but acquitted of—soliciting Private Timothy Brown to possess marijuana, in violation of Article 134, Uniform Code of Military Justice, 10 U.S.C. § 934.

2. The two granted issues addressing this matter were:

 WHETHER THE TRIAL COUNSEL WRONGFULLY WITHHELD, TO THE APPELLANT'S SUBSTANTIAL PREJUDICE, INFORMATION REGARDING THE COMPETENCY AND CREDIBILITY OF THE GOVERNMENT'S ONLY WITNESS AS TO TWO OF THE OFFENSES AND WHOSE TESTIMONY HAD A BEARING ON THE OTHER TWO OFFENSES.
 WHETHER THE GOVERNMENT'S WITHHOLDING OF A MESSAGE DETAILING PRIVATE BROWN'S MENTAL CONDITION PREVENTED THE APPELLANT FROM CHALLENGING BROWN'S COMPETENCY TO TESTIFY.

3. We also granted review of the question "[w]hether the military judge erred to the substantial prejudice of appellant by refusing to give a requested accomplice instruction as to the testimony of Brown on Charge II, Specification 2 [the alleged transfer of methamphetamines on January 28, 1978]." However, because of the disposition we make of the other issues, we need not address this question.

4. Although the testimony of the witness Brown was crucial to the specifications growing out of the January 28 contact between appellant and Brown, it also addressed the February 4 incidents. Brown testified that on the latter date his role simply was to introduce an undercover agent of the Criminal Investigation Division (CID) to appellant as a prospective buyer of appellant's illicit wares and then to bow out. However, Brown's testimony was important as to how he went about setting up this meeting—that is, what he said and did pursuant to the CID agent's direction—and so it cannot be said that Brown's credibility and competence go only to the January 28 offenses.

fering from an overdose of an unknown type of drug. Sub[se]q[uent] Lab Exam revealed that Brown had overdosed on morphone [sic].

2. Brown was treated at the emergency room and released, at which time he was admitted to Ward 17, MAMC (psychiatric ward) for mental evaluation. Coordination with Chief of Psychiatry revealed that Brown was suffering from delusions and extreme paranoia.

3. Brown is curr[ently] undergoing further testing and date of release or disposition is unk[nown] at this time. A polygraph exam cannot be administered.

According to the post-trial affidavit of the trial counsel who prosecuted Brickey, as soon as the Seoul CID informed her of the message, she telephoned

Madigan Army Medical Center and spoke with the attending physician whose name the affiant cannot now recall.

*　　*　　*　　*　　*　　*

The physician indicated that the subject had traces of drugs in his system when admitted to the center and felt that PV2 Timothy Brown was lucid, not suffering from amnesia, and able to understand right from wrong and adhere to the right. He felt that PV2 Brown was competent to testify in a court-martial proceeding and that in fact PV2 Timothy Brown had been released from the center and was enroute to Korea to testify. Satisfied by this conversation, trial counsel did not bring either the message or its contents to the attention of the defense.

Brown arrived back in Korea on May 18, five work days before appellant's originally scheduled trial date. Due to unexplained trial delays, Brown remained in Korea until after June 12, spending his waiting hours in the office of the staff judge advocate. For reasons again unexplained, Brown was deposed on June 6; and sometime after June 12, he returned to the United States for discharge from the Army. Because of his absence, this deposition was later read into evidence at the trial.

During his deposition, Brown was asked by defense counsel why he had gone to the police in the first place. He responded, "I knew what he was doing was wrong." He explained that he used to sell "pot"—though not the kind of drugs with which appellant allegedly was involved—but that he had had a conversion experience: specifically, he had heard that a little girl he had known had overdosed "because of the same thing." Notwithstanding the implications that he had not been involved in anything harder than "pot" and that as a result of the girl's overdose he had come clean at some point prior to appellant's offenses, trial counsel still failed to reveal what she had learned of Brown's problems at Fort Lewis only one month earlier.

The first pretrial Article 39(a) [5] session was held on June 16, and, to accommodate the newly retained civilian defense counsel, trial was delayed until July 13. At trial, Brown's deposition was read into evidence without defense objection. His was the only testimony of any real substance concerning the January 28 occurrence; and it was material as well to the February 4 meeting between appellant and the undercover agent/buyer. Brown's credibility was a central issue in the case; and, in focusing its attack, the defense called no fewer than six witnesses who testified that they would not believe Brown under oath—and sought to portray appellant through several witnesses as an honest, law-abiding soldier. Nevertheless, the members believed Brown and convicted appellant as indicated earlier.

Nothing in Brown's testimony or his behavior at the deposition session had suggested mental disease or incompetence. In fact, the defense did not learn of the matter until after trial when the defense counsel, while perusing the unauthenticated record of trial, chanced upon a copy of the CID message, which trial counsel had sent to the court reporter for inclusion in the allied papers of this record. Consequently, defense counsel directed to the military judge a "Request for Post-sentence Article 39(a) Session," proposing that

[t]he Military Judge should call an Article 39(a) session as soon as possible to con-

5. UCMJ, 10 U.S.C. § 839(a).

duct an inquiry into this situation, and should hear evidence, make findings of fact, enter conclusions of law, and should either order any relief he deems warranted or should forward the record to the Convening Authority to permit him to take such action as he deems appropriate.

In response to the motion, the trial court issued this ruling:

The court has studied the brief submitted by the defense and the case law cited in support of the defense position. The session requested by the defense does not qualify as a proceeding in revision (Article 62(b), UCMJ [10 U.S.C. § 862(b)]) because the presentation of new evidence is precluded in such a proceeding (paragraph 80(c), MCM, 1969 (Rev)). Nor does the requested hearing qualify as a rehearing, since there can be no rehearing prior to the convening authority's disapproval of findings and sentence (Article 63(a), UCMJ). The court must therefore base its decision solely on the language of Article 39(a), UCMJ.

The question of Private Brown's credibility, that is, what weight, if any, should be given his testimony is strictly a jury question which cannot be properly raised at an Article 39(a) session. The only issue raised by this new defense evidence which could validly be litigated at such a session would be the question of the witness's competency to testify. Since the testimony of Private Brown has already been presented to the court members, this issue is moot. There exists therefore, no valid issue to bring before an Article 39(a) session.

Accordingly, the defense request is denied. In the court's opinion, the proper defense course of action at this stage of the proceedings is to bring the newly discovered evidence to the attention of the convening authority for whatever action he deems necessary and appropriate.

Apparently in response to this rebuff (the papers are undated so that we have no way to establish the chronology), defense counsel then addressed to the convening authority a "Request for Post-sentence Article 39(a) Session or *DuBay* Hearing," in which he reiterated his desire for an "inquiry into" the matter. Moreover, both the detailed military counsel and the civilian defense counsel personally met with the convening authority, in the presence of the staff judge advocate, to argue the defense cause. Furthermore, the defense presented a written memorandum to the convening authority in response to a written memorandum which had been prepared for the convening authority by the staff judge advocate.

Arguing that the newly discovered information had impact upon both the credibility and the competence of Brown as a witness, the defense submitted that trial counsel had been under an obligation to reveal the nature of the message to the defense for two reasons: (a) at the time of trial a general agreement existed between trial and defense counsel that trial counsel would automatically provide continuing discovery without requiring defense counsel to make continuing formal requests in each case; and (b), pursuant to *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), and apart from any agreement, the Government was under a duty to disclose such information to the defense.

In her affidavit, trial counsel indicated that the agreement in effect between her and defense counsel extended only to lists of "government witnesses, CID reports in the hands of trial counsel, and any documentary evidence which the Government intended to introduce in its" case-in-chief. In turn, "defense counsel agreed to inform the trial counsel, on a timely basis, of all motions" they "intended to raise as well as matters which" they did not intend to contest "in any particular case." Explaining her decision not to reveal the existence or the contents of the message from Fort Lewis, trial counsel listed these reasons:

a. Affiant having received confirmation that the TWIX did not pertain to the competency of this witness to testify, dismissed the TWIX as going to the credibility of the witness.

b. The TWIX did not go to the areas of a continuing discovery agreement as understood by the trial counsel.

c. PV2 Brown arrived in Korea on 18 May 1978 and was fully available for defense counsel to question until June 12, 1978. In fact, the witness literally spent almost every day of that period in the office of the SJA where both defense and trial counsel are, and were at all times during this time period, located.

d. Trial counsel was aware that defense counsel had knowledge that PV2 Brown had dealt with drugs, at least marijuana by the fact that Captain Thiele [the detailed defense counsel] had seen the individual regarding at least one earlier incident of possession of marijuana during PV2 Brown's assignment to Korea.

In his memorandum to the convening authority, the staff judge advocate conceded that in appropriate circumstances, an Article 39(a) session may be ordered and that the convening authority may direct the military judge to convene such a session. Further, citing *United States v. Webster*, 1 M.J. 216 (C.M.A.1975), he acknowledged that, upon request, the Government must disclose to the accused material evidence favorable to the accused affecting the credibility of a government witness. However, accepting trial counsel's version of the agreement between her and the defense, he opined that the subject "evidence did not fall within the area of mutual agreement between counsel, [and therefore] no duty was created by that agreement to provide a copy of the message to the defense." As to "whether there was[, nonetheless,] an independent duty on" trial counsel to furnish this information, the staff judge advocate, referring to *Agurs*, advised the convening authority that disclosure of the information would be required " 'if the omitted evidence creates a reasonable doubt that did not otherwise exist.' " Applying this standard, the staff judge advocate recommended that, in light of the communication trial counsel had with the attending physician, "the message in question is insufficient to raise an issue of competency under these circumstances." As to

credibility, the staff judge advocate concluded that, applying this standard, denial of the information did not create constitutional error in light of the other substantial evidence which was produced at trial adverse to Brown's credibility.

Presumably on the basis of this advice, the convening authority denied the "Request for Post Sentence Article 39(a) Session." Subsequently, after again considering the matter through the staff judge advocate's post-trial review, the convening authority again found wanting the defense claim for relief; and so he approved the trial results.

## II

When it entertained review of this case and considered assignments of error similar to those now before us, the Court of Military Review agreed with appellant that the information in the message "would have been useful in attacking the credibility of an important prosecution witness (Brown) and should have been disclosed." *United States v. Brickey, supra* 8 M.J. at 759–60. The court reasoned:

> The duty to disclose evidence affecting the credibility of a Government witness, at least when material to either guilt or punishment, is within the obligation imposed on prosecutors by *Brady v. Maryland, supra*. *Marzeno v. Gengler,* 574 F.2d 730, 735 (3d Cir.1978); *United States v. Webster,* 1 M.J. 216, 219 (C.M.A.1975); *United States v. Mougenel,* 6 M.J. 589, 591 (A.F.C.M.R.1978); *United States v. Brakefield,* 43 C.M.R. 828, 833 (A.C.M.R. 1971).

*Id.* at 760 (footnote omitted).

However, that was not the end of its analysis. The court correctly noted that, while "[t]he *Brady* disclosure requirement is no longer limited to situations in which the defense has requested the information," the existence of such a request and the degree of its specificity is material in determining whether the appellant was prejudiced by the nondisclosure. Specifically, the court articulated the following guidelines as to when a rehearing would be necessary:

> When the specific evidence not disclosed had been requested by the defense,

the conviction must be reversed if "the suppressed evidence might have affected the outcome of the trial." *United States v. Agurs, supra,* 427 U.S. at 104, 96 S.Ct. at 2398. If, on the other hand, there was only a general request for all exculpatory evidence (or no request at all) reversal is required only "if the omitted evidence creates a reasonable doubt that did not otherwise exist." *Id.* at 112, 96 S.Ct. at 2402.

*Id.* Considering the nature of the agreement between the defense and trial counsel in this case, the court held that the latter standard applied:

> From the parties' differing accounts, we are inclined to the view that the agreement reached merely eliminated a local requirement that requests for witnesses and documents required to be furnished to the defense in accordance with paragraphs 44*f* (2), 44*h*, and 115 of the Manual for Courts-Martial, United States, 1969 (Revised edition), be specific and be in writing. Even if we are mistaken as to the parties' understanding of the agreement, however, the most favorable interpretation that can be placed on the appellant's view of it is that it amounted only to a general request for exculpatory information and was not a specific request for the information withheld in this case. Therefore, the *Agurs* "reasonable doubt" test applies.

*Id.* (footnote omitted).

Based on the entire record, the Court of Military Review ruled that no reasonable doubt as to appellant's guilt had been raised by the information in question. From its review, which extended to both the content and the impact of Brown's testimony, the court below found "no basis for the assertion that he falsified, misunderstood, or hallucinatorily imagined the details of his receiving from Brickey on 28 January a substance that later chemically proved to be methamphetamine". Moreover, "in the days leading up to the taking of his deposition and in the taking of the deposition itself, neither side noted anything inconsist-

ent with the medical opinion attesting to his testimonial capacity." *Id.* at 761.

### III

### A

In ruling on the defense request for a post-trial Article 39(a) session, the military judge misconceived the scope of the powers available to him after the trial had ended. In recent years, there has been increased recognition that the powers of a military judge do not cease with the court-martial's announcement of the sentence. To some extent, this recognition may have been stimulated by the enactment of the Military Justice Act of 1968, Pub.L. No. 632, 82 Stat. 1335. By granting specific authority for a military judge to "call the court into session without the presence of the members" pursuant to Article 39(a)—which contains no express limitation on the stage of the proceedings to which it applies—Congress made it feasible for a military judge to conduct post-trial proceedings even when the court-martial members cannot be reassembled. Furthermore, replacement of the "law officer" with the "military judge" tended to suggest that Congress meant for this judge to possess the post-trial powers customarily enjoyed by his civilian counterparts in the judiciary.

Our Court perceived that a post-trial Article 39(a) hearing before a military judge often would provide a means for promptly eliminating an ambiguity or omission in the record, or disposing of a claim of error, before necessary witnesses dispersed, memories faded, and witnesses became unavailable. Consistent with that perception and with Manual language, *see* para. 80, Manual for Courts-Martial, United States, 1969 (Revised edition), we ruled that a military judge could conduct a revision hearing on his own motion; and we held that Article 62(b), 10 U.S.C. § 862(b), which allows a convening authority to direct such a proceeding, was not exclusive of the judge's own power to initiate a hearing. *United States v. Roman,* 22 U.S.C.M.A. 78, 46 C.M.R. 78 (1972); *United States v. Barnes,* 21 U.S.C.M.A. 169, 44 C.M.R. 223 (1972). Furthermore, by our own example and oth-

erwise, we have encouraged use of the hearing first employed in *United States v. DuBay,* 17 U.S.C.M.A. 147, 37 C.M.R. 411 (1967). *See United States v. Vietor,* 10 M.J. 69 (C.M.A.1980); *United States v. Killebrew,* 9 M.J. 154 (C.M.A.1980); *Smith v. Helgemoe,* 23 U.S.C.M.A. 38, 48 C.M.R. 509 (1974). We have observed that after trial a military judge may hold a hearing to resolve a dispute as to the accuracy of a record of trial. *United States v. Anderson,* 12 M.J. 195 (C.M.A.1982). In *United States v. Palenius,* 2 M.J. 86 (C.M.A.1977), we intimated that a military judge has certain powers after trial to allow trial defense counsel to withdraw and, at the same time, to assure the uninterrupted representation of the accused. In *United States v. Witherspoon,* 16 M.J. 252 (C.M.A.1983), we recognized the alternative of a post-trial hearing before a military judge with respect to jury misconduct.

Contrary to the trend towards approval of greater post-trial powers and responsibilities on the part of a military judge, the judge in the case at bar ruled that the post-trial Article 39(a) session requested by Brickey's counsel should not be held, since it could not qualify as a revision proceeding or a rehearing. In so ruling, he took too limited a view of revision proceedings. Paragraph 80c of the Manual, *supra,* on which the judge apparently relied, directs that, since in a revision proceeding the action to "be taken is entirely corrective, a case will not be reopened by the calling ... of witnesses or otherwise." However, we interpret this Manual language to be concerned only with reopening of the case and hearing witnesses as to guilt or innocence; and we do not view it as directed toward a situation where, after a trial has ended, the judge conducts a hearing as to matters which concern the integrity of the proceedings. Even if testimony must be taken, the military judge may consider in a revision proceeding matters like alleged jury misconduct, command influence on court members, and withholding of evidence by the Government. Moreover, he may convene—and in the proper exercise of his discretion sometimes should convene—such a revision proceeding on his own motion, so long as the subject of the proceeding is "one that can be rectified without material prejudice to the substantial rights of the accused." *United States v. Roman, supra* 22 U.S.C.M.A. at 80, 46 C.M.R. at 80, quoting *United States v. Barnes, supra* at 170, 44 C.M.R. at 224. *See also United States v. Carpenter,* 15 U.S.C.M.A. 526, 36 C.M.R. 24 (1965).

In *Roman* we remarked that, under the practice which long antedated the Uniform Code, a court-martial might " 'reconsider and reform its findings and sentence' " before "the court transmit[ted] its proceedings to the reviewing authority." 22 U.S.C.M.A. at 80, 46 C.M.R. at 80. Since under Article 54 of the Code, 10 U.S.C. § 854, authentication of the record by the judge or, in some instances, by a substitute official, precedes transmittal of the case to the convening and supervisory authorities for action, authentication of the record would seem to be the logical cutoff for a court-martial's authority to conduct revision proceedings on its own motion. However, thereafter, such a proceeding can be conducted by direction of the convening authority pursuant to Article 62(b).

■ Even if the hearing requested by the defense would not fit within the mold of a "revision proceeding," there was also other precedent for holding it. In this connection, we note that *DuBay* hearings on various matters have been directed not only by our Court and the Courts of Military Review, but also by convening and supervisory authorities. *See, e.g., United States v. Dyer,* 5 M.J. 643 (A.F.C.M.R.1978); *United States v. Hashaw,* 3 M.J. 529 (A.F.C.M.R. 1977); *United States v. Howard,* 2 M.J. 1078 (A.C.M.R.1976). If such hearings can be directed by these authorities for purposes of appellate review, we see no reason why, prior to authentication of the record, they cannot be conducted on the judge's own motion. As already noted, paragraph 80c allows a revision proceeding to be conducted on the judge's own motion. This permission to do so accords with the policy that, in the interest of justice, corrective action should take place as promptly as possible, since otherwise evidence may become unavailable or irreversible damage in-

flicted. While the Manual contains no express permission for a judge to initiate a *DuBay* hearing on his own motion, this omission is not surprising, since the Manual does not concern itself explicitly with this type of hearing. Nonetheless, in light of the underlying policy, we conclude that—like a revision proceeding and subject to the same restriction that it not materially prejudice an accused's substantial rights—a military judge may convene a *DuBay* hearing on his own motion prior to authentication of the record of trial.

From the foregoing analysis we conclude that the military judge could properly have conducted the Article 39(a) session which the defense requested. Probably such a hearing could be viewed as a revision proceeding held on the judge's own motion. If not, it would nonetheless qualify as a *DuBay* hearing convened under Article 39(a) to allow the judge to make findings of fact and state conclusions of law which would assist in the appellate review of the case.

### B

■ In justifying his denial of the defense request, the military judge in his ruling observed that the credibility of Private Brown's testimony "is strictly a jury question which cannot be properly raised at an Article 39(a) session." Furthermore, the judge concluded that the issue of Brown's competence was "moot," because "the testimony ... ha[d] already been presented to the court members."

We fail to follow this logic. If the Government withheld or suppressed evidence concerning the credibility or competence of a witness, the violation of appellant's rights would not be "moot." Moreover, the circumstance that the members already had heard the testimony of Private Brown would not eliminate the issues of competence and credibility. Appellant was still entitled to claim that the court members should not have heard Brown's testimony at all and that, if they heard the testimony, it should only have been under circumstances which would have permitted them to gauge its credibility more accurately.

### C

The staff judge advocate advised the convening authority that the requested post-trial hearing was not necessary. In doing so, he relied heavily on the affidavit of the trial counsel as to the scope of the understanding between the Government and the defense concerning pretrial discovery. Clearly, the defense interpretation of that agreement differed from that of the prosecution; and the only way to determine accurately what had been understood between the parties would be through "resolution by a primary factfinding tribunal before which all material evidence may be presented and the parties may be heard." *See Smith v. Helgemoe, supra* 23 U.S.C.M.A. at 40, 48 C.M.R. at 511 (*DuBay* hearing to resolve disagreement as to terms of pretrial agreement). Moreover, we note that, under trial counsel's description of her obligations pursuant to her understanding with defense counsel, she undertook few, if any, duties other than those to which the Government already was subject under paragraph 44(h) of the Manual for Courts-Martial. Thus, it is rather hard to understand why the defense would have entered into such an arrangement under which they incurred duties but did not receive corresponding benefits. In any event, although trial counsel was completely sincere in her belief concerning the scope of her agreement with defense counsel as described in her affidavit, her good faith would not be decisive as to appellant's rights. *Cf. United States v. Agurs, supra,* 427 U.S. at 108, 110, 96 S.Ct. at 2399–2400, 2401.

As another support for his conclusion that a hearing was unnecessary, the staff judge advocate reasoned that, because the credibility of Brown had been criticized by a number of defense witnesses and the court-martial members nonetheless believed him, the withheld information would not have changed the outcome. Obviously, the staff judge advocate did not recall "the straw that broke the camel's back." The fact that

court-martial members believe a witness despite circumstances A and B, which tend to impair his credibility, does not mean they will continue to believe him if impeaching circumstance C is added. This possibility of disbelief would seem to be especially great when, as here, the witness is testifying by deposition and is not present in court for observation by the trier of fact.

## IV

### A

In *Brady v. Maryland, supra* 373 U.S. at 87, 83 S.Ct. at 1196–1197, the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." More than a decade later, the Court amplified this ruling in *United States v. Agurs, supra.*

The facts in *Agurs*, briefly summarized, were that the defendant was convicted of second-degree murder for stabbing one Sewell. The defense was self-defense, and there was evidence at trial that Sewell was carrying two knives, one of which was the weapon which caused his death. Three months after the conviction, defense counsel filed a motion for a new trial asserting that he had discovered that Sewell had a prior criminal record that would have further evidenced his violent character and that the prosecution had failed to disclose this record to the defense. The district

court denied the motion, but the Court of Appeals reversed. The Supreme Court granted certiorari to determine applicability of the decision in *Brady v. Maryland, supra.*

 The Court held that *Brady* "arguably applies in three quite different situations." *Id.* 427 U.S. at 103, 96 S.Ct. at 2397. The first is where "the undisclosed evidence demonstrates that the prosecution's case includes perjured testimony and that the prosecution knew, or should have known, of the perjury." *Id.* (footnote omitted.) In such a situation the "conviction ... must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Id.* (footnote omitted), citing *Mooney v. Holohan,* 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935). The second is where there is "a pretrial request for specific evidence" in the possession of the prosecution which is withheld by the prosecution. There the rule is that,

> if the subject matter of such a request is material, or indeed if a substantial basis for claiming materiality exists, it is reasonable to require the prosecutor to respond either by furnishing the information or by submitting the problem to the trial judge.

*Id.* 427 U.S. at 106, 96 S.Ct. at 2399. The third situation, which was the case in *Agurs,* was where exculpatory evidence was in the possession of the prosecution but unknown to the defense. In such instances it is immaterial if no request is made, or only a general request is submitted. The test to be applied is that[6]

---

6. The Supreme Court noted that "[t]he problem" of nondisclosure actually "arises in two principal contexts." The first—"in advance of trial, and perhaps ... [at] trial as well"—involves the judgment of a prosecutor as to "what, if anything, he should voluntarily submit to defense counsel." The second—"after trial"—concerns a judge deciding "whether a nondisclosure deprived the ... [accused] of his right to due process." Nonetheless, "the same standard must apply" to both time frames, "[f]or unless the omission deprived the defendant of a fair trial, there was no constitutional violation requiring that the verdict be set aside; and absent a constitutional violation, there was no breach of the prosecutor's constitutional

duty to disclose." *United States v. Agurs,* 427 U.S. 97, 107–08, 96 S.Ct. 2392, 2399–2400, 49 L.Ed.2d 342 (1976). However, the Court reiterated a matter which we now emphasize to trial counsel:

> Nevertheless, there is a significant practical difference between the pretrial decision of the prosecutor and the post-trial decision of the judge. Because we are dealing with an inevitably imprecise standard, and because the significance of an item of evidence can seldom be predicted accurately until the entire record is complete, *the prudent prosecutor will resolve doubtful questions in favor of disclosure.*

the prosecutor will not have violated his constitutional duty of disclosure unless his omission is of sufficient significance to result in the denial of the defendant's right to a fair trial.

*Id.* at 108, 96 S.Ct. at 2400. However, the Court held:

The proper [Constitutional] standard of materiality must reflect our overriding concern with the justice of the finding of guilt. Such a finding is permissible only if supported by evidence establishing guilt beyond a reasonable doubt. It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed.

*Id.* at 112, 96 S.Ct. at 2401–2402 (footnote omitted.)

B

■ The second and third situations discussed in *Agurs* were addressed by the Court of Military Review's opinion in this case. Where the defense has made a request for specific information which, then, is nonetheless withheld by the prosecution, due process is thereby denied if "the suppressed evidence might have affected the outcome of the trial." *Id.* at 104, 96 S.Ct. at 2398. Where the defense has made only a general request "for 'all *Brady* material' or for 'anything exculpatory,'" *id.* at 106, 96 S.Ct. at 2399 —or where the defense has made no request at all—and the prosecution withholds information discoverable under *Brady,* due process is thereby denied only "if the omitted evidence creates a reasona-

ble doubt that did not otherwise exist." *Id.* at 112, 96 S.Ct. at 2402. In each of these instances, the focus is upon the harm done to the defendant, not on the moral culpability or the willfulness of the prosecutor; "[i]f the suppression of evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor." *Id.* at 110, 96 S.Ct. at 2401.

In the absence of a hearing on the matter in which both the prosecution and defense could present their version of pretrial understanding as to discovery, we are not sure that we accept the view of the Court of Military Review that the agreement constituted no more than a request for all exculpatory information—a general *Brady* request.[7] Assuming, however, the correctness of the premise adopted by the court below, the failure to disclose the information concerning Brown would be material only if it would have "create[d] a reasonable doubt that did not otherwise exist," *id.* at 112, 96 S.Ct. at 2402, in the context of the entire record.

If the information in question went solely to credibility, the task of applying this standard would be less burdensome[8]; but that is not the case. When trial counsel received the initial message, she immediately recognized the significance of this information to Brown's competence to testify as a witness. According to her own post-trial affidavit, trial counsel specifically asked whether Brown was competent to testify during her telephone conversation with the attending physician, which took place shortly after

---

*Id.* at 108, 96 S.Ct. at 2399–2400 (emphasis added). Appellant's case aptly demonstrates the difficulty of a prosecutor before trial trying to walk the fine line concerning an item of evidence which might well fall on either side of that line; had this prosecutor followed the sage advice in *Agurs,* the fairness of appellant's trial, regardless of its outcome, would not have been in question.

7. If it was the defense who requested the polygraph on Brown referred to in the CID message from Fort Lewis, then most clearly this would have constituted a specific request for information and the denial of the response to that request would have to be measured against the

more generous standard looking to whether it "might have affected the outcome of the trial." *United States v. Agurs, supra* at 110, 96 S.Ct. at 2400–2401. We infer, however, that such was not the case or else the defense somehow would have followed up on its request.

8. Even so, reasonable minds still might differ on the conclusion reached. For instance, while the rationale of the Court of Military Review is legitimate, it might be equally legitimate to reason that the impact of a psychiatrist's testimony undermining a witness' credibility would be greater than that even of several lay witnesses.

she received the message. Unfortunately, she failed to appreciate that it was not her role as prosecutor to decide unilaterally on the basis of this conversation that no question existed as to the witness' competence. Instead, the role of determining competence belongs to the trial judge, *see* para. 148*a*, Manual, *supra*. Where evidence which seriously calls into question a witness' competence comes to the attention of the prosecution in a court-martial, that officer must, at least, make it known to the defense counsel, who can then, if he chooses, ask for a ruling from the judge.

When the Government's conduct makes it impossible for an appellate court to gauge the impact of the withheld information under the appropriate *Brady* standard,[9] it is not the accused who must suffer the consequences. The defense counsel must be allowed to fulfill his responsibility, and trial counsel's failure here to disclose this information—so important to the fundamental fairness of the trial—thwarted the performance of that responsibility, and may have thwarted justice as well.

### C

Beyond all this, we believe that the first *Brady* situation also is present in this case. That situation, typified by *Mooney v. Holohan, supra,* exists when "the undisclosed evidence demonstrates that the prosecution's case includes perjured testimony and that the prosecution knew, or should have known, of the perjury." *United States v. Agurs, supra* at 103, 96 S.Ct. at 2397 (footnote omitted). Addressing the approach to be used in such a case, the *Agurs* Court said:

In a series of subsequent cases, the Court has consistently held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is *any reasonable likelihood that the false testimony could have affected the judgment of the jury. . . .* In those cases the Court has

applied a strict standard of materiality, not just because they involve prosecutorial misconduct, but more importantly because they involve a corruption of the truth-seeking function of the trial process.

*Id.* at 103–04, 96 S.Ct. at 2397 (footnotes omitted, emphasis added), citing *Pyle v. Kansas,* 317 U.S. 213, 63 S.Ct. 177, 87 L.Ed. 214 (1942); *Alcorta v. Texas,* 355 U.S. 28, 78 S.Ct. 103, 2 L.Ed.2d 9 (1957); *Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); *Miller v. Pate,* 386 U.S. 1, 87 S.Ct. 785, 17 L.Ed.2d 690 (1967); *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); and *Donnelly v. DeChristoforo,* 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974).

■ In his deposition Brown clearly gave the impression that his prior drug involvement had been limited to marijuana and that, even as to that substance, he had terminated his use before appellant's alleged offenses. According to him, his cessation of drug activity and his cooperation with military authorities in apprehending appellant was a direct outgrowth of the overdosing on some drug of a child whom he had known. As trial counsel should have recognized, the impression generated by this testimony was inaccurate, since, after the alleged offenses but prior to his deposition, Brown had overdosed on drugs to such an extent that he had been hospitalized at an Army medical center. Nevertheless, the prosecution did nothing to correct the erroneous impression or reveal the falsehood to the defense; and so the court members were led to believe that Brown was a reformed drug dealer who, as a direct result of an emotional personal experience, was helping to ferret out others still in the dirty business. Such tactics on the Government's part are clearly prohibited. *Cf. Alcorta v. Texas* and *Napue v. Illinois,* both *supra.*

We do not know whether the court members would have disbelieved Brown's deposition testimony if they had been aware of

9. Even so, had the military judge or the convening authority recognized the need for the hearing requested by the defense counsel upon discovery of this information, the damage done might have been obviated.

the true facts. As Private Brown was a principal witness to the prosecution case, we are convinced a reasonable likelihood existed that the findings by the members of the court-martial were adversely affected by trial counsel's failure to set the record straight.[10]

V

The Government has urged that, even if the findings as to the offenses of January 28 are set aside because of the withholding of evidence, the findings as to the other offenses, which occurred a week later, should be affirmed. We note, however, that in some respects Brown's testimony relates to those later offenses,[11] and so, in view of the type of error involved here, we believe it to be in the interest of justice that all the findings be set aside in order to eliminate the real risk that appellant was convicted of any charge because of unconstitutional action on the Government's part.

The decision of the United States Army Court of Military Review is reversed. The findings and sentence are set aside. The record of trial is returned to the Judge Advocate General of the Army. A rehearing may be ordered.

Judges COOK and FLETCHER concur.

10. Since the Court of Military Review discussed the problem of nondisclosure in constitutional terms, *see* 8 M.J. 757, 759–60, we also have done so. However, the same result can be reached on statutory grounds under Article 46, UCMJ, 10 U.S.C. § 846, which provides that the defense "shall have equal opportunity to obtain ... evidence in accordance with such regulations as the President may prescribe." *See generally* para. 115c, Manual for Courts-Martial, United States, 1969 (Revised edition).

11. *See* n. 4, *supra.*