GOVERNMENT OF THE VIRGIN ISLANDS, Appellee

v.

ANGEL RUIZ, Appellant

No. 73-1319

and

CARLOS CORCINO, Appellant

No. 73-1318

United States Court of Appeals
Third Circuit

Argued December 4, 1973

Filed March 5, 1974

---

JULIO A. BRADY, ESQ., United States Attorney, ISHMAEL A. MEYERS, ESQ., Assistant United States Attorney, Charlotte Amalie, St. Thomas, V.I., *for government*

DAVID V. O'BRIEN, ESQ., Christiansted, St. Croix, V.I., *for appellant Ruiz*

ROBERT A. ELLISON, ESQ., Christiansted, St. Croix, V.I., *for appellant Corcino*

Before SEITZ, *Chief Judge*, MARIS, and GIBBONS, *Circuit Judges*

## OPINION OF THE COURT

GIBBONS, *Circuit Judge*

Appellants Ruiz and Corcino appeal from a judgment of sentence imposed by the District Court of. the Virgin Islands. Ruiz and Corcino are two of four defendants named in an information charging murder, 14 V.I.C. § 922 (a) (2) and robbery 14 V.I.C. § 1861 of one Lawrence

Angus. The other two defendants named are Rafael San Kitts and Angel Ventura. Prior to the trial Ventura apparently became a fugitive. San Kitts pleaded guilty to the robbery count and testified for the government at the trial of Ruiz and Corcino. He implicated both in the robbery and murder. The government also introduced the sworn written statement of Ruiz, from which references to his co-defendants were deleted. Ruiz' statement is substantially consistent with San Kitts' testimony. Both Ruiz and Corcino took the stand and denied participation. Ruiz repudiated his statement and Corcino offered alibi testimony. The jury found both guilty on both counts and each was sentenced to life imprisonment for murder and fifteen years for robbery.

On this appeal Corcino contends:

(1) that his trial should have been severed from that of Ruiz because he was prejudiced by the admission of Ruiz' statement. Bruton v. United States, 391 U.S. 123 (1968).

(2) that the trial court improperly limited the scope of cross-examination of San Kitts.

Both defendants contend:

(3) that they were prejudiced by the government's failure to make full disclosure of exculpatory materials pursuant to Rule 16, Fed. R. Crim. P. and Brady v. Maryland, 373 U.S. 83 (1963).

(4) that the trial court erred in refusing to admit into evidence a toxicological report on the blood and urine of the victim.

We will consider these contentions seriatim.

## 1. The Severance Motion

■ Each defendant relying on Bruton v. United States, supra, moved before trial for a severance on the ground that the confession of one or more of the co-defendants would tend to incriminate him. At that stage the trial court, weighing the competing considerations favoring joinder under Rule 8 over severance under Rule 14,

Fed. R. Crim. P., tentatively denied the motions for severance on condition that any statements, before they are admitted, be edited so that they refer only to the activity of the confessor and do not mention the activities of any co-defendant, and so that the contents be admitted by testimony and with the writing itself excluded. See United States v. Rickey, 457 F.2d 1027, 1030 (3d Cir. 1972), cert. denied, 409 U.S. 863 (1972); United States v. Lipowitz, 407 F.2d 597, 602 (3d Cir. 1969), cert. denied, 395 U.S. 946 (1969). The trial court also withheld final decision on Corcino's motion for severance to be sure that in light of the evidence received at the trial there would be no tacit reference to him. At the trial the government produced a court reporter who on May 19, 1972 took a sworn deposition from Ruiz, the transcript of which had been edited in accordance with the court's pre-trial ruling. Corcino's counsel renewed his Bruton objection. (Tr. at 93). However, the court ruled that having reviewed the statement for conformity with the pre-trial ruling, he would permit it to be read as edited with the understanding that he would entertain specific objections during the course of the reading. (Tr. at 94). The questions and answers were then read to the jury. They implicate Ruiz and other unnamed assailants in the robbery-murder. There is nothing in the statement as read identifying Corcino as one of the perpetrators. Thereafter San Kitts testified. He identified the perpetrators, besides himself, as Ruiz, Corcino and Ventura. He was extensively cross-examined both by Ruiz' and by Corcino's attorneys. After the government rested, Ruiz took the stand. He categorically denied participation and repudiated the May 19, 1972 statement, claiming it was the result of suggestion and coercion by the police. Ruiz was cross-examined by the prosecutor about the fact that in his May 19, 1972 statement he had implicated San Kitts and Corcino. (Tr. at 236). Corcino's

attorney at this point made a motion for a mistrial. The court ruled:

"It is on the basis of Bruton that I deny the motion for a mistrial and also at this time, since Ruiz has taken the stand, deny your motion for a severance. You will recall I had reserved it. I reserved it only until such time as I would know whether Ruiz would take the stand. Now that he has taken the stand I finalize my decision that there won't be a severance and I deny any mistrial because you have a right to have confrontation." (Tr. at 241).

Thereafter the prosecutor's cross-examination of Ruiz with respect to the May 19, 1972 statement continued until Ruiz' attorney stated that he had no objection to the whole transcript being admitted. Corcino's attorney stated:

"Defendant Corcino has no objection to its introduction, your Honor." (Tr. at 246).

It was admitted as exhibit G-6. Corcino's attorney did not cross-examine Ruiz. He had the opportunity to do so. On this record we see no Bruton violation. See Wade v. Yeager, 415 F.2d 570 (3d Cir. 1969), cert. denied, 396 U.S. 974 (1969). The severance motion was properly denied.

2. The Scope of Cross-Examination of San Kitts

■ San Kitts' direct testimony implicating Ruiz and Corcino appears in eleven pages of the transcript. He was cross-examined for thirty pages by Ruiz' attorney about discrepancies between his testimony and the several statements he had made to the police, and about his possible motives for testifying favorably for the government. He was then cross-examined by Corcino's attorney for eight pages about discrepancies between his testimony and his prior statements and about his memory and his motives for testifying. On redirect the prosecutor, referring to a statement that had been used in cross-examination, developed that some of the discrepancies had resulted from threats by a defendant, asked certain clarifying questions, and concluded:

159

"Q. Assuming that there are some differences in the statements that you made, is it true or not that Angel Ruiz and Carlos Corcino were with you when Mr. Lawrence Angus was murdered and robbed?

A. Yes, sir." (Tr. at 172).

At that point, without objection from Corcino, the four statements given by San Kitts, about which he had already been extensively cross-examined, were received in evidence. (Tr. at 174). On recross, Ruiz' attorney asked:

"Q. Will you tell the jury, the Court, the defendants, the United States Attorney and myself, please, Mr. San Kitts, where you lied in all of these statements?

[The Prosecutor]: Objection, Your Honor.

THE COURT: I will sustain the objection. We cannot go through all those statements again." (Tr. at 175).

\* \* \*

[Ruiz' Attorney]: "I presume your Honor will give me the opportunity, then, to discuss with him the threats that he alleges were made against him, which was brought out on redirect.

THE COURT: Yes, you may." (Tr. at 176).

Five pages of cross-examination on that subject follow. Corcino contends that the limitation of Ruiz' cross-examination reflected in the quoted ruling prejudiced him. His attorney made no recross-examination, no offer of proof, and no protest with respect to the ruling. Aside from these obstacles to consideration of the ruling on his behalf, the ruling was, on the record as it stood at that point, a sound exercise of the court's discretion in controlling the scope of cross-examination on credibility issues.

### 3. Disclosure of Exculpatory Materials

■■■ The defendants contend that the government's compliance with an apparently informal arrangement for production of materials pursuant to Rule 16, Fed. R. Crim. P.

and Brady v. Maryland was grudging, tardy, and prejudicial. Turning to the specifics:

A. A knife obtained from San Kitts and the victim's shirt were sent by the Virgin Islands police to the F.B.I. laboratory. The F.B.I. report, suggesting that the knife could not be related to the holes in the shirt (the victim died of multiple stab wounds), was produced at the trial and was received in evidence. The court made no findings as to the cause of the late disclosure. None was required since no prejudice occurred.

B. The knife referred to in the report was not produced prior to trial. It was produced at trial, introduced into evidence, and used extensively in the cross-examination of the medical expert who testified as to cause of death. It was referred to in San Kitts' statement, which had been produced at pre-trial. Assuming tardy production, there was no prejudice.

C. The victim's shirt was not produced apparently because the prosecutor never got it back from the F.B.I. But the discrepancies between the size of San Kitts' knife, the wounds, and the cuts in the shirt as described in the F.B.I. report, were extensively explored. Again there was no prejudice.

D. A toxicological report as to the blood and urine of the victim were produced at the trial and fully examined by the defense attorneys. As will be seen hereafter, its exclusion was not prejudicial. No prejudice appears from its late production since it was in any event properly excluded.

E. Statements of San Kitts inconsistent with his testimony were produced at the trial. The defendants used them extensively in his cross-examination. They contend the statements should have been disclosed sooner. This contention is unsound. 18 U.S.C. § 3500(b). But assuming there was some obligation to make disclosure sooner, the

161

extensive use made of the statements and their actual receipt in evidence negates any possibility of prejudice.

■ F. A tape record of a statement by Corcino was disclosed at the pre-trial hearing. The prosecutor told the defense attorneys it was unusable. They neither listened to it nor interviewed the person in whose presence it was made. After Corcino testified, that person testified in rebuttal as to his recollection of Corcino's testimony. There was no concealment, no possible surprise, and no prejudice.

■ G. One pretrial statement of Ruiz was not disclosed until after he took the stand. Withholding this statement was in clear violation of Rule 16(a)(1) since by informal agreement all Rule 16 materials were to be produced. The prosecutor's reason for withholding the statement was that he believed it was taken without appropriate Miranda warnings, and that it would not be admissible. That reason is insufficient, since under Harris v. New York, 401 U.S. 222 (1971), the statement could be used for impeachment purposes if the defendant took the stand. Thus the defendant's attorney was entitled to be informed of it pursuant to his Rule 16(a)(1) motion. Its late production had the potential for creating a trap for a possibly forgetful defendant. We disapprove of the practice of withholding any statement by the defendant, admissible or not, when a Rule 16(a)(1) motion has been made. In this case, however, the trial court appreciated the problem presented by the late production and ruled that the undisclosed statement could not be used for impeachment purposes pursuant to Harris v. New York, supra. This ruling precluded any prejudice.

As to each of the items about which the defendants complain of late production, on this record there was no possible prejudice. But we take the occasion to suggest that a more meticulous attention to the government's obligations under Rule 16 and Brady v. Maryland, supra, is

highly desirable. We have no reason to believe that the tardy disclosures in this case were the result of any deliberate policy of concealment. An affirmative policy of prompt compliance would, however, avoid the risk of needlessly causing a mistrial or a reversal.

## 4. Admissibility of the Toxicological Report

The government's first witness, Burgos, established that the victim Angus was drinking in a bar from 10:00 p.m. until at least 3:00 a.m. and was "Well, a little high." (Tr. at 32). Angus was murdered some time between 3:00 a.m. and 6:25 a.m., and on May 3, 1972, the police discovered his body near his car beside the road. Dr. Glenn, a pathologist who performed the autopsy, found thirteen stab wounds and multiple contusions or bruises, abrasions or scratches and lacerations of the face and scalp, abrasions of the left elbow, abrasions of the right lower leg, and a total depressive skull fracture. He testified that the major injuries were stab wounds which penetrated the heart and the aorta. His pathological report was admitted in evidence at the defendants' request, and was used in examining Glen in an attempt to show that San Kitts' knife could not have caused the wounds. This attempt was not particularly successful. Ruiz' attorney, referring to the pathological report said to the court:

"There is another item here and that is that in the state that Mr. Angus was that he was able to drive the car to the location at which he was murdered. The doctor conveniently left out additional diagnosis, which is in here, which is alcoholic intoxication, including samples. And the samples are incredible, 0.15 alcohol in his blood, 0.2 alcohol by weight in his urine." (Tr. at 74).

The significance of this statement is that San Kitts testified, and Ruiz' statement admitted that the defendants had followed Angus' car, pulled ahead of it, and forced him to

163

stop at the spot where he was killed. Arguably, if he was too intoxicated to drive, San Kitts and Ruiz were lying.

Attached to the pathologist's report was a toxicological report on the victim's blood and urine, prepared from samples sent to Puerto Rico by Dr. Glenn. The government did not object to the admissibility of the pathologist's report, but did object to the toxicological report because the person who prepared it was not present. The court sustained this objection. Dr. Glenn was then cross-examined as follows:

"Q. Dr. in your report the list is pathological diagnosis, is that correct?

A. Yes.

Q. In that you have indicated on direct examination certain of the things that occurred that you diagnosed as causes of death, is that correct?

A. Yes.

Q. Would you read one of those which you did not read? What is the last item listed under pathological diagnoses?

A. I have acute alcoholic intoxication with a question mark after it.

Q. Will you describe what it is, Doctor?

A. Well, the reason I put that in, what we call our gross examination, is because during the autopsy the tissue of the body had a heavy alcoholic aroma. You can't go by your notes to make a diagnosis of acute alcoholism or chronic alcoholism but you suspect. So I put that in there to indicate my suspicion of chronic alcoholism and a question mark after it to indicate it would be verified by a toxicological examination." (Tr. at 78–79).

Since Dr. Glenn had not performed the toxicological tests he could not say of his own knowledge what was the alcoholic level in the decedent's blood. A day later, after Dr. Glenn had been excused both attorneys made an offer of proof with respect to the toxicological report.

"The admission of this report is crucial to the defense because in particular the toxicological report indicates certain matters in the blood, rather, correction, the urine of the deceased which raise a

164

number of questions about his whereabouts from the last time he was seen alive from the time he was killed." (Tr. at 252).

The government objected that it would be deprived of the opportunity to examine the doctor who prepared the toxicological report. The court sustained the objection. (Tr. at 255). No request was made for a continuance so that a witness might be produced who could authenticate the contents of the report.

 The defendants contend that the report was admissible pursuant to 28 U.S.C. § 1732. We need not address that question, for even if we were to hold that the report was admissible without the presence of the toxicologist who made the tests we would and do find that their exclusion was not in the circumstances of this case prejudicial. The evidence already had the victim afloat in a sea of alcoholic beverages. At most, the report is cumulative. There is no claim that it would have suggested a cause of death other than stab wounds. If the alcoholic state of the deceased suggests that these wounds were inflicted at a different place and by different persons than San Kitts testified and Ruiz admitted, a remote suggestion at best, that alcoholic state was sufficiently established by Dr. Glenn's testimony.

## CONCLUSION

We find no error warranting a new trial for either defendant. The judgment of the district court will be affirmed.