**UNITED STATES of America,
Appellant,**

v.

**STARUSKO, John.**

No. 83–5479.

United States Court of Appeals,
Third Circuit.

Argued Jan. 10, 1984.
Decided March 5, 1984.

Paul J. Brysh (argued), Asst. U.S. Atty., Pittsburgh, Pa., for appellant.

Russell J. Ober, Jr. (argued), Rose, Schmidt, Dixon & Hasley, Pittsburgh, Pa., for appellee.

Before ALDISERT, HIGGINBOTHAM, and SLOVITER, Circuit Judges.

## OPINION OF THE COURT

ALDISERT, Circuit Judge.

In this appeal by the government, brought pursuant to 18 U.S.C. § 3731, we are asked to decide whether the district court abused its discretion in precluding a

key government witness from testifying at trial in a criminal case as a sanction for the government's failure to turn over to the defendant certain exculpatory evidence prior to trial. We hold that although the government withheld materially exculpatory evidence, in direct violation of a valid district court order, it was an abuse of discretion for the district court to issue a preclusion order based on a violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), because the defendant was not prejudiced by the government's nondisclosure.

## I.

This controversy arises out of certain pretrial proceedings in the federal prosecution of John Starusko, a real estate tax assessor of Allegheny County, Pennsylvania, charged by the government with participation in a scheme to extort money in exchange for the lowering of county tax assessments. At a pretrial hearing held on June 3, 1983, the district court, at defendant's request, issued a disclosure order pursuant to *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), directing the government to turn over to the defense all exculpatory material in its possession, including evidence that "could be used by the defendant to impeach the government's witnesses." App. at 23A–24A. It then warned the government that if such material were not disclosed by June 6, 1983—a date two weeks in advance of the scheduled date of trial—it would preclude those witnesses from testifying at trial. The government never objected to this order.

When the district court issued the disclosure order, the prosecutor had in his possession three F.B.I. reports that were based on interviews with Patrick Logan, another property assessor and the alleged mastermind of the tax assessment scheme, who was slated to be the government's key witness at trial. The reports, the relevant portions of which appear in the margin,[1] contain inconsistent summaries of statements by Logan as to defendant's knowledge of Logan's involvement in the tax assessment scheme. None of the reports

---

1. The first F.B.I. report, which covers an April 20, 1982 interview with Logan, provides in relevant part:

 [In] regards to an assessment fixed by John Starusko in the Elizabeth Township, Pa., Logan admitted that Starusko knew the complete details concerning the fact that Logan was going to receive money for the fixing of this assessment; but Logan said that Starusko did not receive any money from that deal. According to Logan, it would not have been possible for him to have completed that deal without Starusko's help and he would not have received any money if Starusko had not aided him by getting on the telephone and talking with Sullivan and explaining to him that the assessment in Elizabeth Township had been adjusted.

 App. at 53A.

 The second F.B.I. report, which relates to an April 21, 1982 interview with Logan, provides in pertinent part:

 Logan was then asked questions concerning some of the statement he had made the previous day during the first contact he had with the interviewing agents. He basically changed the statements he had made concerning Lou Vitsas and John Starusko. In regards to those two individuals, he denied saying that they knew anything about the fact that he was going to receive money for adjusting assess-

ments on business properties. He mentioned that neither individual ever received money from him for any help they may have provided in the lowering of these assessments.

*Id.* at 55A–56A.

The third F.B.I. report, which concerns a June 11, 1982 interview with Logan, provides in relevant part:

In either the second or the third telephone conversation, Logan told Starusko that if the assessment was lowered on the property, Logan could get something out of it. In response to the statement by Logan that Logan could get something in return for a lower assessment, Starusko replied, "I don't want to know nothing." Starusko eventually agreed to lower the assessment on the property in the words of Logan, "As a favor to me." Starusko did not want anything for agreeing to lower the assessment.

. . . . .

Sullivan gave Logan a $700 bribe in return for having the assessed value on the property in Elizabeth Township lowered. Logan told Sullivan that Starusko was getting some of the money, but Logan was not telling Sullivan the truth. Logan told Sullivan that Starusko was getting some of the $700 because Logan wanted Sullivan to give Logan the money.

*Id.* at 57A–58A.

were turned over to defendant by the June 6, 1983 disclosure order deadline. The government made the first and third reports available sometime within the week before trial. The second report, which indicates that defendant had no knowledge of Logan's involvement in the scheme, was never turned over to defendant, but came into defense counsel's possession through a third party a few days prior to trial.

Believing that the second report was exculpatory material that should have been turned over to him pursuant to the district court's disclosure order, defendant filed a motion in limine asking that the government be prohibited from offering Logan's testimony at trial as a sanction for its noncompliance. Notwithstanding the district court's ruling at the time it issued its order that impeachment evidence is *Brady* material that must be disclosed, the government responded to the motion in limine as follows:

> Defendant was not entitled to this information before trial because it is not exculpatory but could be used only to impeach the witness' testimony and thus is subject to disclosure under the Jencks Act, Title 18, United States Code, Section 3500,[2] not *Brady*.

App. at 46A. From his response, it appears that the prosecutor understood both the spirit and the letter of the court's pretrial order, but believing that the F.B.I. report in his possession was not *Brady* material, he deliberately refused to turn that report over to defendant. After considering both the motion and the response, the court entered an order in which it "exercise[d] its discretion to sanction for failing to comply with the *Brady* case by precluding the testimony of Patrick Logan at the trial of this case." App. at 51A.[3]

---

**2.** The Jencks Act provides in relevant part:

> (a) In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpena, discovery, or inspection until said witness has testified on direct examination in the trial of the case.

> (b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.

18 U.S.C. § 3500(a), (b).

**3.** The full order reads:

> AND NOW, this 23rd day of June, 1983, upon consideration of Defendant's Second Motion in Limine filed in the above captioned matter on June 17, 1983,

> IT IS HEREBY ORDERED that said Motion is GRANTED in part and DENIED in part, to wit:

> 1. GRANTED, in that Patrick Logan will be precluded from testifying at the trial of this case for the following reasons:

> a. At the pretrial hearing in this matter, held on June 3, 1983, the Court ordered the government to turn over all materials of a directly exculpatory nature, pursuant to *Brady v. Maryland*, 373 U.S. 83 [83 S.Ct. 1194, 10 L.Ed.2d 215] (1963), by June 6, 1983.

> b. In response to the Court's order at the hearing, the government informed the Court that there was no directly exculpatory material.

> c. On June 17, 1983, the defendant filed this motion, attaching to it an FBI investigation report of April 23, 1982, which summarized a statement of Patrick Logan.

> d. In that report, the FBI agent summarized Patrick Logan's statement as follows: "[Logan] denied saying that ... [Starusko] knew anything about the fact that he was going to receive money for adjusting assessments on business properties." Defendant's Second Motion in Limine, Exhibit C.

> e. Defendant's Second Motion in Limine further reveals that he obtained this report through some means other than the government and that, without producing this report, the government had asserted by letter of June 6, 1983, that it had produced, and was producing through the June 6th letter, all exculpatory material. Defendant's Second Motion in Limine, Exhibits A and B.

> f. The Court finds that the aforesaid report is of a directly exculpatory nature and, therefore, further finds that the government failed to comply with this Court's order of June 3, 1983, by not turning over all *Brady* material.

> g. Accordingly, the Court exercises its discretion to sanction for failing to comply with the *Brady* case by precluding the testimony of Patrick Logan at the trial of this case. *See United States v. Campagnuolo*, 592 F.2d 852, 858 (5th Cir.1979).

The preclusion order prompted the government's appeal.

Before us, the government contends that the district court abused its discretion in precluding Logan from testifying at trial. It argues that the court was wrong to base this sanction on the government's failure to turn over *Brady* material to the defendant prior to trial because: (1) the second F.B.I. report is not *Brady* material; (2) even if it were, the court had no authority to require its disclosure prior to trial; and (3) that failure did not prejudice the defendant so as to violate Brady.

## II.

■ In *Brady v. Maryland*, the Supreme Court held that due process forbids a prosecutor from suppressing "evidence favorable to an accused upon request ... where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. at 1196.[4] *Brady* thus requires disclosure by the government of evidence that is both exculpatory and material. *United States v. Higgs*, 713 F.2d 39, 42 (3d Cir.1983); *United States ex rel. Marzeno v. Gengler*, 574 F.2d 730, 735 (3d Cir.1978). Exculpatory evidence includes material that goes to the heart of the defendant's guilt or innocence as well as that which might well alter the jury's judgment of the credibility of a crucial prosecution witness. *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972); *Higgs*, 713 F.2d at 42. Evidence impeaching the testimony of a government witness is exculpatory when the credibility of the witness may be determinative of a criminal defendant's guilt or innocence. *Giglio*, 405 U.S. at 154, 92 S.Ct. at 766;

*United States v. Gengler*, 574 F.2d 730, 735 (3d Cir.1978). If the exculpatory evidence "creates a reasonable doubt" as to the defendant's culpability, it will be held to be material.[5] *United States v. Agurs*, 427 U.S. 97, 112, 96 S.Ct. 2392, 2401, 49 L.Ed.2d 342 (1976).

■ We have no doubt that the second F.B.I. report qualifies as *Brady* material. Patrick Logan, the alleged source of the statements contained in the report, is critical to the government's case. As a key prosecution witness, his credibility may well be determinative of guilt or innocence. *Giglio*, 405 U.S. at 154, 92 S.Ct. at 766; *Gengler*, 574 F.2d at 735. Thus, evidence that could be used to impeach Logan's credibility, would clearly be exculpatory. A close examination of the second F.B.I. report, juxtaposed with the first and third F.B.I. reports, illustrates its value as impeachment evidence.

In the first F.B.I. report, Logan allegedly stated that "Starusko knew the complete details concerning the fact that Logan was going to receive money for the fixing of an assessment." App. at 53A. A day later, in the second F.B.I. report, Logan "basically changed the statements" he had made the previous day. App. at 55A. He reportedly asserted that Starusko had "[no knowledge] about the fact that [Logan] was going to receive money for adjusting assessments on business properties." App. at 55A–56A. Finally, in the third F.B.I. report, Logan apparently returned to his original belief that Starusko did have knowledge of Logan's involvement in the extortion scheme. According to the report, "Logan told Starusko that if the assessment was lowered on the property, Logan could get something out of it. In response

---

2. DENIED, in all other respects. App. at 50A–51A.

4. The *Brady* rule traces its roots to two decisions of this court, *United States ex rel. Thompson v. Dye*, 221 F.2d 763, 765 (3d Cir.1955), and *United States ex rel. Almeida v. Baldi*, 195 F.2d 815, 820 (3d Cir.1952), *cert. denied*, 345 U.S. 904, 73 S.Ct. 639, 97 L.Ed. 1341 (1953), which stand for the proposition that suppression of evidence favorable to the accused is sufficient to amount

to a denial of due process. *Brady*, 373 U.S. at 87, 83 S.Ct. at 1196.

5. This is the standard of materiality to be applied where the defendant has made only a general request for exculpatory evidence. *See Agurs*, 427 U.S. at 112, 96 S.Ct. at 2401. As the defendant here asked the government to supply him with all exculpatory evidence in its possession, we find his request to be general and apply the standard accordingly.

..., Starusko replied, "I don't want to know nothing." App. at 57A. Because the second F.B.I. report contains an alleged statement as to the defendant's knowledge that is inconsistent with other statements Logan purportedly made to the F.B.I., it can be used to impeach Logan's credibility. It is particularly solid impeachment evidence because it goes against the thrust of the prosecution's case. We conclude, therefore, that the report is exculpatory, not only because it might well alter the jury's judgment of Logan, but also because its content goes to the heart of the defendant's guilt or innocence.

■ Moreover, we find the report to be material. We recognize that, generally, it is difficult to analyze, prior to trial, whether potential impeachment evidence falls within *Brady* without knowing what role a certain witness will play in the government's case. *Agurs*, 427 U.S. at 108, 96 S.Ct. at 2399; *Higgs*, 713 F.2d at 43. But here, Logan's role is clear. He is the linchpin of the prosecution's case. It logically follows, therefore, that the second F.B.I. report, which affects his credibility and sheds light on the underlying question of substantive guilt, is material for impeachment purposes. It is "obviously of such substantial value to the defense that elementary fairness requires it to be disclosed." *Agurs*, 427 U.S. at 110, 96 S.Ct. at 2401.

Accordingly, we cannot say that the district court erred in characterizing the F.B.I. report as impeachment material qualifying under the *Brady* rule. But this still does not end our inquiry. We now must determine whether the district court had authority to require disclosure of the report prior to trial.

### III.

In *Higgs*, this court announced that the district court has general discretionary authority to order the pretrial disclosure of *Brady* material "to ensure the effective administration of the criminal justice system." 713 F.2d at 44 n. 6. In so doing, the court perpetuated our longstanding policy

of encouraging early production. *See, e.g., Gengler*, 574 F.2d at 739 (Seitz, C.J., concurring) ("a prosecutor's timely disclosure obligation with respect to [*Brady*] material cannot be overemphasized"); *United States v. Kaplan*, 554 F.2d 577, 578 (3d Cir.1977) ("we disapprove and discourage a practice of delayed production"); *Government of the Virgin Islands v. Ruiz*, 495 F.2d 1175, 1179 (3d Cir.1974) (encouraging "an affirmative policy of prompt compliance").

■ Today, we affirm this court's longstanding policy and applaud the district court's effort to ensure prompt compliance with *Brady*. We flatly reject the notion, espoused by the prosecution, that "it is the government, not the district court, that in the first instance is to decide when to turn over *Brady* material." Brief for Appellant at 28. The district court may dictate by court order when *Brady* material must be disclosed, and absent an abuse of discretion, the government must abide by that order. Moreover, we expressly disapprove of the government's belated attempt to question the district court's authority. When it first received the court's disclosure order, the government never quarreled with its mandate that all exculpatory material be turned over prior to trial. It never produced evidence or argument to the court to demonstrate how its prosecution would be impaired by having to disclose, prior to trial, all exculpatory evidence in its possession. Instead, the prosecutor waited to complain until after the preclusion order had been imposed. In light of these circumstances, we reject completely the government's attempt on appeal to have us excuse its noncompliance with an order of the district court on the grounds that the court had no authority to issue the order.

### IV.

Having found that the report withheld by the government was in fact *Brady* material and that the district court had authority to order its disclosure prior to trial, we now must determine whether the government's failure to turn over that report to the de-

fendant constituted a violation of *Brady* on which the court could bottom its preclusion order.

When a defendant discovers after trial that the prosecutor has withheld *Brady* material, the court ordinarily grants him a new trial, predicated on the precept that "[w]e are dealing with the defendant's right to a fair trial mandated by the Due Process Clause of the Fifth Amendment to the Constitution." *Agurs,* 427 U.S. at 107, 96 S.Ct. at 2399. If this matter had proceeded to trial and defendant not been apprised of the second F.B.I. report until after trial, and if Patrick Logan had testified at trial as to a fact bearing materially on Starusko's guilt or innocence, we would have no hesitation in concluding that a due process violation had been made out. But such is not the case here because the government's failure to disclose was exposed prior to trial. Moreover, by reason of the government's appeal, the trial has yet to be had.

When the district court learned that the prosecutor had knowingly refused to obey its disclosure order, it sanctioned the government for "failing to comply with the *Brady* case." App. at 51A. In imposing its sanction, the court apparently drew an analogy to the remedy available to it under Rule 16(d)(2), F.R.Crim.P., which provides that where there is a violation of a discovery rule, the court may issue an order "prohibit[ing] the party from introducing evidence not disclosed." Perhaps, too, it analogized to the Jencks Act, which states: "[i]f the United States elects not to comply with an order of the court ... the court shall strike from the record the testimony of the witness." 18 U.S.C. § 3500(d).

Unlike Rule 16 and the Jencks Act, however, *Brady* "is not a discovery rule, but a rule of fairness and minimum prosecutorial obligation." *United States v. Beasley,* 576 F.2d 626, 630 (5th Cir.1978), *cert. denied,* 440 U.S. 947, 99 S.Ct. 1426, 59

L.Ed.2d 636 (1979). There can be no violation of *Brady* unless the government's nondisclosure infringes the defendant's fair trial right. *Higgs,* 713 F.2d at 42, 43. To constitute a *Brady* violation, the nondisclosure must do more than impede the defendant's ability to prepare for trial; it must adversely affect the court's ability to reach a just conclusion, to the prejudice of the defendant. *United States v. Campagnuolo,* 592 F.2d 852, 861–62 (5th Cir.1979). "No denial of due process occurs if *Brady* material is disclosed in time for its effective use at trial." *Higgs,* 713 F.2d at 44; *see also Kaplan,* 554 F.2d at 580. Moreover, "the government is not obliged under *Brady* to furnish a defendant with information which he already has or, with any reasonable diligence, he can obtain himself." *Campagnuolo,* 592 F.2d at 861.

Here, because the defendant suffered no prejudice from the government's failure to disclose the report, there was no *Brady* violation. Defense counsel's independent discovery of the statement—fortuitous though it was—negates any argument that the defendant was deprived of rights assured by the Constitution. Absent a showing of prejudice, we conclude that the district court abused its discretion in basing its preclusion order on a violation of *Brady.*[6]

Our finding that the district court abused its discretion, however, does not mean that we approve of the government's conduct in this case. The prosecution's deliberate disobedience of the district court's disclosure order was not only an affront to the court's integrity, but it also exposes a lacuna in existing case law. In defense of its noncompliance, the government argued:

> Defendant was not entitled to this information before trial because it is not exculpatory but could be used only to impeach the witness' testimony and thus is subject to disclosure under the Jencks

---

6. Had the district court not premised the imposition of its sanction on a *Brady* violation, the sanction might have passed muster as a valid exercise of its inherent authority to punish for the willful disregard of a court order. *See, e.g., Higgs,* 713 F.2d at 44 n. 6. Since this issue was not raised here or in the district court, we will not meet it at this time.

Act, Title 18, United States Code, Section 3500, not *Brady.*

App. at 46A. We have several problems with the government's stated reasons for withholding exculpatory material from the defendant.

 First, the government was mistaken in classifying the report as Jencks Act material and withholding it on that basis. It is true that under the Jencks Act:

[I]n any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a government witness or prospective Government witness ... shall be the subject of a subpoena, discovery, or inspection until said witness has testified on direct examination in the trial of the case.

18 U.S.C. § 3500(a). A "statement," as defined by the Act, is:

(1) a written statement made by said witness and signed or otherwise adopted or approved by him;

(2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or

(3) a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury.

18 U.S.C. § 3500(e). But here, the report at issue contains the F.B.I.'s interpretation of remarks Logan made to them during an interview. It does not, therefore, contain a "statement," as defined by the Jencks Act, that is subject to discovery only after the witness has testified on direct examination.

 Second, the government was mistaken in ignoring the district court's *Brady* disclosure order because it believed that the Jencks Act was dispositive. Even if the report contained statements by Logan that could be classified properly as Jencks Act material, that does not mean that it would be exempted from a pretrial disclosure order based on *Brady.* All Jencks Act statements are not necessarily *Brady*

material. The Jencks Act requires that any statement in the possession of the government—exculpatory or not—that is made by a government witness must be produced by the government during trial at the time specified by the statute. *Brady* material is not limited to *statements* of witnesses but is defined as exculpatory *material;* the precise time within which the government must produce such material is not limited by specific statutory language but is governed by existing case law. Definitions of the two types of investigatory reports differ, the timing of production differs, and compliance with the statutory requirements of the Jencks Act does not necessarily satisfy the due process concerns of *Brady.* *See Campagnuolo,* 592 F.2d at 858–60; *United States v. Murphy,* 569 F.2d 771, 774 (3d Cir.), *cert. denied,* 435 U.S. 955, 98 S.Ct. 1588, 55 L.Ed.2d 807 (1978).

 Third, and most important, the government was wrong to withhold impeachment evidence that the district court had specifically stated was encompassed by its *Brady* order simply because it disagreed with the court's view of the law. Where the government has doubt as to the exculpatory nature of the material it possesses or the timing of disclosure required by an order of the district court, "it is reasonable to require the prosecutor to respond either by furnishing the information or by submitting the problem to the trial judge." *Agurs,* 427 U.S. at 106, 96 S.Ct. at 2399. Counsel does not have the right to "knowingly disobey an obligation under the rules of a tribunal," as did the prosecutor here, unless it openly asserts that no valid obligation exists. Model Rules of Professional Conduct Rule 3.4 (1983); *see Walker v. City of Birmingham,* 388 U.S. 307, 87 S.Ct. 1824, 18 L.Ed.2d 1210 (1967). This is not to say that counsel does not have the capacity to disobey, but it is to say that a price must be paid for disobedience, and this price takes the form of sanctions.

## V.

▆ Remaining for decision, then, is what we perceive to be the most difficult part of this case—difficult because we find no precise guidance in the rules or the cases. We must inquire as to what sanction is available to the court where the government deliberately disregards a court directive to disclose *Brady* material prior to trial. A litigant who refuses to obey a direct order of the court ordinarily may be cited for contempt. 18 U.S.C. § 401. Here, however, the litigant is the United States of America, and although we do not decide, we are not at all confident that the government, *qua* the government, as distinguished from a specific officer, agency, or precise identifiable unit of that government, may be subject to penalties of fine or imprisonment—the normal sanctions for civil and criminal contempt. *See* Cyclopedia of Federal Practice § 87.81 (3d ed. 1976). But the possibility that the government may be immunized from ordinary contempt procedures does not mean that the government or its authorized agents—here, the United States Attorney and his assistants—are privileged to commit an affront to the court by conduct which, if performed by any other litigant, would be deemed contumacious, if not contemptuous. Thus, we must look elsewhere for an appropriate sanction.

▆ It is clear that "a prosecutor who intentionally fails to make disclosure to the defense, at the earliest feasible opportunity, of the existence of evidence which tends to negate the guilt of the accused as to the offense charged," violates certain standards of professional conduct, Standards for Criminal Justice § 3-3.11 (1980). *See also* Model Rules of Professional Conduct Rule 3.8 (1983). He can be subject, therefore, to disciplinary sanctions for his misconduct. Standards for Criminal Justice § 3-1.1. Likewise, he can be sanctioned for "engag[ing] in conduct that is prejudicial to the administration of justice." Model Rules of Professional Conduct Rule 8.4 (1983). Certainly, the deliberate violation of a pretrial order imposed by the court could subject an attorney for the government to disciplinary punishment under these standards. But again, we are looking to sanction the government, *qua* the government. Accordingly, we must put to one side the possible violations by government counsel here of recognized standards of professional conduct.

Yet notwithstanding the apparent unavailability of appropriate sanctions, this court cannot, at this late hour, overlook previous specific warnings to the government as to what this court perceived to be acceptable standards for the administration of criminal justice in the conduct of criminal trials in the courts of this judicial circuit. As early as March 5, 1974, speaking through Judge Gibbons, we suggested "that a more meticulous attention to the government's obligations under … *Brady v. Maryland* is highly desirable," and we recommended "an affirmative policy of prompt compliance." *Ruiz*, 495 F.2d at 1179. On April 11, 1977, speaking through Judge Weis, we said that "we disapprove and discourage a practice of delayed production" of *Brady* materials. *Kaplan*, 554 F.2d at 578. On February 27, 1978, Chief Judge Seitz reemphasized the necessity of "timely disclosure" of these materials and indeed, described it in terms of a prosecutorial obligation: "In my view a prosecutor's timely disclosure obligation … cannot be overemphasized …." *Gengler*, 574 F.2d at 739 (Seitz, C.J., concurring).

This case obviously indicates that not all government prosecutors have heeded these harbingers. Some prosecutors continue to play games with both the district courts and defense counsel, unmindful of their ethical obligations as "ministers of justice." Here, for example, the trial, which was estimated to last only four or five days, was scheduled to begin on June 20, 1983. The court ordered all exculpatory material to be turned over by June 6, 1983. As events turned out, the government refused to disgorge the second F.B.I. report on Friday, June 17, 1983, but it apparently was willing to turn it over on the next working day, Monday, June 20, 1983, or

thereabouts, immediately after Logan, its chief witness, testified. Neither by brief nor at extensive oral argument has the government furnished this court with a satisfactory reason why this time frame for disclosure was critical to the conduct of its case. It has failed to demonstrate how its case or any of its witnesses would have been compromised had the prosecutor respected the court order.

█ Even had the report qualified as Jencks Act material as well as *Brady* material, we are not convinced that the prosecutor chose to acknowledge the fundamental difference between the *Brady* rule and the Jencks Act. Under *Brady,* the defendant is apprised of the existence of exculpatory material; should the matter pertain to a possible government witness and should the government elect not to call that witness, the defendant has options of how to proceed on the basis of the exculpatory information received. The same is not true under the operation of the Jencks Act: should the government elect not to produce the witness at trial whose statements are in its hands and whose testimony could conceivably assist the defendant, the defendant may never know that statements— exculpatory or otherwise—exist. Where a court has ruled that impeachment material falls more under *Brady,* instead of or in addition to, the Jencks Act, and orders it disclosed, the defendant has received a guarantee of protection. When the government refuses to comply with that order, its noncompliance may totally deprive the defendant of a fair trial, or even the grounds for appellate review, if the material does not emerge from the secret government files. Under such circumstances, the defendant has been denied protection of the court and is placed entirely at the mercy of the United States Attorney, or more realistically, of the assistant assigned to the case. Only if the defendant is the beneficiary of fortuitous happenstance by discovering the materials through extrajudicial means, as was the case here, are his rights vindicated. The "game" will go on, but justice will suffer.

Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly. An inscription on the walls of the Department of Justice states the proposition candidly for the federal domain: "The United States wins its point whenever justice is done its citizens in the courts."

*Brady,* 373 U.S. at 87, 83 S.Ct. at 1197. We think this is an important precept. It is so important, that we should not permit it to be violated in the courts of this judicial circuit. The judiciary must take the steps necessary to insure, as much as possible, that the deeds of prosecutors will match their stated promise.

Accordingly, this court and the district courts will monitor the future conduct of government prosecutors. If it is determined that the practice so vigorously condemned by us here is repeated in the future, then judges of this court will not hesitate to call the prosecutors' conduct to the attention of the appropriate disciplinary authorities. We will also, if we deem it appropriate, in the exercise of our judicial function, consider the adoption of a prophylactic rule of law in a future case or controversy; or, in the exercise of our administrative responsibility, we will make recommendations to appropriate committees of the Judicial Conference of the United States or of the Congress.

## VI.

The preclusion order of the district court will be vacated and the cause remanded for further proceedings.