UNITED STATES, Appellee,

v.

Robert J. FUENTES, Private First Class, U.S. Army, Appellant.

No. 38,526.
CM 437786.

U.S. Court of Military Appeals.

June 18, 1984.

For Appellant: *Captain Dennis E. Brower* (argued); *Colonel Edward S. Adamkewicz, Jr.* and *Major Grifton E. Carden* (on brief); *Lieutenant Colonel John F. Lymburner* and *Major James F. Nagle.*

For Appellee: *Captain Michael C. Chapman* (argued); *Major Ted B. Borek* and *Captain Brian X. Bush* (on brief); *Colonel R.R. Boller* and *Captain Paul G. Thomson.*

### Opinion of the Court

EVERETT, Chief Judge:

A general court-martial composed of officer and enlisted members tried appellant at Fort Ord, California, on a charge of assaulting Private First Class Gary Upshaw with intent to commit murder and convicted him of assault with intent to commit voluntary manslaughter, both in violation of Article 134, Uniform Code of Military Justice,

10 U.S.C. § 934. Fuentes was sentenced to a bad-conduct discharge, confinement for 5 years, forfeiture of $279.00 pay per month for 60 months, and reduction to pay grade E–1. The convening authority approved the sentence.

Private Wayne Cyr, a member of appellant's company, had been present during at least part of the stabbing incident which gave rise to the charge against Fuentes. Because of his suspected participation, he also was charged with assaulting Upshaw with intent to murder him, as well as with an aggravated assault on the alleged victim, in violation of Article 128, UCMJ, 10 U.S.C. § 928. His trial by general court-martial was completed on October 26, 1978 —just before appellant's trial began [1]—and resulted in findings of guilty of assault and battery and aggravated assault, and a sentence to six months' confinement and total forfeitures.

Before the Court of Military Review, Fuentes assigned as error the legal and factual insufficiency of the evidence to convict him of assault with intent to commit voluntary manslaughter. However, after considering the record of Cyr's trial,[2] the Court of Military Review entered an order, the pertinent parts of which are:

WHEREAS, it appears from the record of trial that the Government prosecuted the charge of assault with intent to commit murder against appellant on the theory that appellant, during an affray, stabbed the victim after overcoming his resistance and the attempted intervention of a purported bystander; and

WHEREAS, the Government established its case against appellant through the testimony of a purported bystander rather than the victim and without disclosing that the purported bystander had been convicted as appellant's accomplice

---

1. On October 6, Judge James E. Noble, who presided ably in appellant's trial, conducted an out-of-court session, during which Fuentes was arraigned. However, the court members were not assembled until October 27.

2. *United States v. Cyr*, CM 437766, *pet. for new trial denied*, June 26, 1979. The Court of Military Review judicially noted that record of trial which was "on file in the office of the Clerk of Court." 8 M.J. 830, 831 n.2 (A.C.M.R. 1980). That record was submitted to our Court in connection with our review of appellant's conviction.

and was testifying pursuant to a grant of immunity; and

WHEREAS, the Government, in the prior trial, successfully prosecuted the bystander on the charge of striking the same victim with a mop handle and as an accomplice to appellant's charged assault under the theory that he actively assisted in subduing the victim; the Government establishing this through the testimony of the victim; and

WHEREAS, the credibility of the accomplice and the victim was an important factor in both cases, it is by this Court this day ORDERED

1. That appellate government counsel and appellate defense counsel submit further pleadings on the following questions:

a. Whether the Government, by using the testimony of the accomplice rather than the victim in the prosecution of appellant, created a false impression as to the facts and circumstances surrounding the offense, or at least failed to correct a false impression that arose from the testimony of the accomplice.

b. If the answer to a. above is in the affirmative, was the appellant prejudiced thereby and what is the most appropriate remedy?

Ultimately, the Court of Military Review concluded that Captain David Tyrrell, the trial counsel who prosecuted both Cyr and Fuentes,[3] had engaged in prosecutorial misconduct. 8 M.J. 830 (1980). Two of the judges found "no reasonable likelihood" that the court members' findings had been affected thereby, and they affirmed the findings and sentence. Judge Watkins, dissenting, would have authorized a rehearing because "remedial action of this nature is required under circumstances such as these, not only as a matter affecting the appellant's constitutional right to a fair trial but one intimately related to the standing and integrity of the military judicial process." Id. at 834.

We granted review of this issue assigned by appellant:

WHETHER THE GOVERNMENT'S KNOWING USE OF FALSE TESTIMONY, THROUGH ITS PRIMARY WITNESS, VIOLATED THE APPELLANT'S CONSTITUTIONAL RIGHT TO A FAIR TRIAL, WHERE THAT TESTIMONY WAS THE ONLY DIRECT EVIDENCE PRESENTED AGAINST THE APPELLANT.

However, after scrutiny of appellant's and Cyr's records of trial, we have concluded that no prosecutorial misconduct occurred, so we affirm.

I

On the evening of July 25, 1978, Fuentes stabbed Private Upshaw four times in the back during an affray while they were in a barracks latrine at Fort Ord. The wounds were severe. According to pretrial statements by Upshaw, Cyr aided and abetted appellant in the assault.

On July 27, the charge of assault with intent to murder Upshaw was preferred against Fuentes. Four days later an identical charge was preferred against Cyr, along with a charge that he had assaulted Upshaw by striking him on the side and face with a means likely to produce grievous bodily harm—to wit, a metal mop handle.

The Article 32, UCMJ, 10 U.S.C. § 832, hearing in appellant's case commenced on August 9 and recessed later that same day. At that time Upshaw was on convalescent leave until August 14; but when he failed to return from leave, the investigating officer reconvened the hearing on August 23 and concluded taking evidence. However, when Upshaw returned, the Article 32 hearing for Fuentes was reopened on September 12, 1978. The investigating officer recommended trial by general court-martial, and, pursuant to this recommendation and the advice of his staff judge advocate,

---

**3.** Cyr was tried before a different judge, Judge Nancy Hunter, and also had a different defense counsel.

the convening authority on September 28 referred the charge for trial by general court-martial.[4]

Meanwhile the Article 32 investigation of the charges against Cyr resulted in a recommendation for trial by general court-martial, and on September 14 the convening authority referred the charges as recommended. An Article 39(a)[5] session took place on September 20, 1978, at which Cyr's defense counsel informed Judge Hunter that he intended to request a psychiatric examination for Upshaw to determine if he was incompetent to testify because of "a drug-induced inability to perceive." During this same session prospective trial dates were discussed, and trial counsel, Captain Tyrrell, emphasized that it was "important to the Government" that Cyr be tried before Fuentes. His explanation was that the Government intended to immunize Cyr after his trial in order for him to testify against appellant.

Another Article 39(a) session in Cyr's case took place on September 27, at which time the defense moved successfully for a reopening of the Article 32 investigation. However, the reopened investigation resulted in the same recommendation of trial by general court-martial and in reaffirmance by the convening authority of his referral of the charges against Cyr to that tribunal.

On October 6, an Article 39(a) session was held in appellant's case. At this time the defense moved for a psychiatric examination of Upshaw, the alleged victim, just as Cyr's defense counsel had stated he planned to do in the other case. On this motion, the first witness called by Captain Barry Pittman—defense counsel for Fuentes—was Captain Charles Byler, who was defending Cyr. Byler testified about information he had received which indicated that Upshaw suffered from memory loss, used drugs, and had a poor reputation for truth and veracity. According to Byler, Upshaw's "story changed markedly from the witness statement which ... I had initially until the time that I interviewed him at my office, and with the times I observed his testimony at the two 32's."

Later in the session on October 6, Upshaw himself was called "as a court witness" and testified that, during his tour of duty in Korea in 1977–78, he had consumed large quantities of alcohol and Korean drugs and, as a result, had developed memory problems. For some six months while in Korea, he had seen an Army psychiatrist, Dr. Gene Purvis, almost weekly because of "[s]tomach problems, and head problems." He had also seen another psychiatrist in Korea in connection with drug and alcohol dependence. Upshaw denied belief in any Supreme Being, but said he believed in "[s]urviving"; and he claimed that he would not testify falsely.

Ultimately, Judge Noble—the judge in appellant's case—denied the motion for psychiatric evaluation and ruled that Upshaw was competent to testify. However, he cautioned:

I will tell both counsel, and I want you to be very alert to this in these proceedings should I see anything which will cause me to change my position, and Upshaw is not competent and was not competent, then I will direct this examination. But my ruling now is and my observations, and my personal view of him, my personal examination of him is that he understands the moral necessity of telling the truth despite the fact that he says that he does not believe in God, and despite the fact that he says that survival is paramount.

In light of this ruling, the defense asked that Dr. Purvis be produced as a witness, and the judge granted this request.

Previously, on September 22, Captain Pittman, the defense counsel for Fuentes, had requested production of Cyr as a witness. The request stated:

---

**4.** Because of appellant's request for enlisted members, the charge was later rereferred to a general court-martial with both officer and enlisted members.

**5.** Uniform Code of Military Justice, 10 U.S.C. § 839(a).

PV2 Wayne A. Cyr, 005–60–9340, Company C, 127th Signal Battalion ... is expected to testify substantially in accordance with his sworn statement dated 26 July 1978. The defense understands that at the present time the Government intends to call PV2 Cyr as a witness in the case of *United States v. PFC Robert J. Fuentes.* Since PV2 Cyr refused to testify at the Article 32 proceeding on grounds of his Fifth Amendment right against self-incrimination, it is expected he will be ordered to testify under a grant of testimonial immunity. *In the event the Government decides not to call PV2 Cyr as a Government witness, the defense would wish to do so.* PV2 Cyr was an eyewitness to the incident and, therefore, a material witness. For this reason, it is requested that an order of testimonial immunity be granted by the Convening Authority that would compel PV2 Cyr to testify if called by either the Government or the defense.

(Emphasis supplied).

This request by appellant prompted this colloquy near the end of the hearing on October 6:

MJ: Okay, let me ask you to be sure that I understand what happens if Cyr is granted immunity?

TC: Right now, we are anticipating that Cyr will be testifying either for the government...

MJ: Well is that under agreement?

TC: It would be pursuant to a grant of immunity. He is the—That's the companion case.

MJ: Yes.
Well, in any way, the motion is no longer before me to require my ruling, is it?

DC: Well sir, it's not before you at this time based on representation of counsel that he will be made—he will testify under a grant, either at his request or my request. In other words, the grant will probably cover if I want to call him as my witness.

On October 11, Judge Hunter—the judge in Cyr's trial—held another Article 39(a) session. After ascertaining that the reopened Article 32 investigation had been completed, a supplemental pretrial advice prepared by the staff judge advocate, and the charges rereferred by the convening authority, she considered the admissibility of several extrajudicial statements that Cyr had made. Before ruling thereon, the court recessed.

When court reconvened on October 14, Judge Hunter discussed with counsel a defense request that Fuentes be granted immunity so that he could testify for Cyr. Finally, she decided that the convening authority had not abused his discretion in refusing to immunize Fuentes. Also, she ruled that, although defense counsel would not be allowed to impeach Upshaw by showing that he had recently been convicted of larceny in Korea and sentenced to a bad-conduct discharge, the witness could be asked on cross-examination whether, in fact, he had stolen the property.

Just as counsel for Fuentes had already done, Cyr's counsel requested Dr. Purvis as a witness, and the judge remarked: "I have a feeling that we are going to have to continue this trial until that witness is available." After the defense indicated that a continuance would be welcome, this discussion ensued between the judge and trial counsel:

MJ: Captain Tyrrell, what is your schedule like?

TC: Well, ah—the problem is this. The Government is going to try the accused first and then going to try Private Fuentes. Now, Fuentes is scheduled for the 23rd so that case will also have to be taken off the docket.

MJ: Why is that, Sir?

TC: Because we intend to immunize the accused in this case after he testifies and then utilize him as a witness in the Fuentes trial.

MJ: Can't you do that anyway? Have you got a basis?

TC: Then it requires a change of counsel to try the case. I couldn't try the Fuentes case then, because I obviously

—well, then I couldn't try the Cyr case then—that's what I'm saying—because I would have been here when he testified against Fuentes.

A few minutes later the trial counsel reiterated: "The Government will not try Fuentes first."

During the hearing on October 14, Cyr's defense counsel made "the same motion that was raised in Fuentes ... to have Private Upshaw examined and determine whether or not he has the ability to distinguish right from wrong insofar as telling the truth under oath or affirmation." Judge Hunter heard some of the same evidence that had been presented to Judge Noble when this motion had been considered a week earlier in the Fuentes case. Once again Private Upshaw was called to testify—this time by the Government, rather than by the court. In denying the defense motion, Judge Hunter explained that her own observation of Upshaw satisfied her that he was competent. She also pointed out that his memory lapses had occurred while he was under the care of Dr. Purvis, who would be made available as a witness.

On October 19, the court reconvened in Cyr's trial to receive his pleas and to consider challenges to the appointed court-members. This process was completed the next day. On October 23 there was a discussion of instructions; and on October 24, after some preliminary instructions to the court members and an opening statement by the Government, the presentation of evidence began in Cyr's trial.

The opening statement outlined the government position that Cyr had gone to the latrine with Fuentes to assist him in obtaining redress from Upshaw for stealing a gun owned by Fuentes. To aid Fuentes, Cyr had struck Upshaw in the face, head, and elsewhere with a metal mop handle. In his opening statement, trial counsel conceded that Upshaw had been involved with drugs and alcohol, experienced memory problems, had made inconsistent statements, and had been convicted of larceny.

The primary government witness against Cyr was the victim, Private Upshaw. He testified that, while stationed previously at Fort Ord, he and Fuentes had been roommates. Shortly before Upshaw departed for Korea in 1977, Fuentes had falsely accused him of stealing Fuentes' handgun. On July 25, 1978, after playing basketball, Upshaw went to the first-floor latrine of a nearby building. When he exited a latrine stall, he saw Cyr standing "at port arms with a [metal] mop handle" in his hands. At that time Fuentes came around a corner, flipped out a knife, and demanded $250.00 in payment for the gun which he claimed Upshaw had stolen. Fuentes lunged at Upshaw with the knife, but Upshaw grabbed the blade of the knife and Fuentes' wrist with his right hand. In the ensuing struggle Upshaw fell to the floor, and Cyr probed him in the head and abdomen with the mop handle. The knife fell out of Fuentes hand, whereupon Cyr strangled Upshaw, who lost consciousness; and when he awoke, he felt stings in his back, rolled over, and saw blood. He managed to get outside the building and fell to the grass because he couldn't breathe anymore. Thereafter, he was taken to the hospital.

Upshaw admitted that, while in Korea during January and February of 1978, he had used drugs and alcohol with resulting memory problems. Also, he had been tried by court-martial in Korea for stealing a cassette player from another soldier. Moreover, he had participated in black marketing and had been in fights. Upshaw also attempted to explain seeming inconsistencies between his pretrial statements and his testimony in court.

Sergeant William Benner testified that he had seen Cyr and Fuentes together shortly before the incident and at that time Fuentes had a knife with a three to four-inch blade. Joseph Phillips testified that he had seen Cyr and Fuentes outside the company dayroom about an hour before the stabbing, and Fuentes had told Cyr, "I'll get him."

Private Milton Allgood heard noise in the latrine and a voice yelling, "Come help me." When Allgood walked to the door of the latrine, Cyr exited and said, "You didn't see anything. Everything is cool." Next to Cyr was Fuentes who said approximately "the same thing." At that point Upshaw fell out of the latrine and Allgood observed blood on him. Sergeant Jose Murrufo testified that, after the stabbing incident, Cyr told him that he had entered the building because "Fuentes was going to get Upshaw."

Captain William Peery, an Army doctor, testified that, upon examining Upshaw the evening of July 25, he found three stab wounds in the back right chest and one in the back left chest. Upshaw had a collapsed lung, which made his condition "life-threatening."

Cyr testified in his own defense that he had been drinking beer with Fuentes on the afternoon of July 25, but Upshaw's name had not come up. Later he was looking for Fuentes and heard him say, "Come here." The voice came from a latrine, which Cyr entered. Thereupon he saw Upshaw behind Fuentes with his arms around Fuentes' chest, and both men had their hands on a knife. The knife belonged to Fuentes, but at that moment nobody had control of it. Fuentes had a bloody slash on his forehead, which was bleeding, and he looked frightened. Cyr picked up the mop handle for his own protection and held it at port arms. As Upshaw and Fuentes fought, he tried to push them away. He poked Upshaw in the side with the mop handle. When he saw the knife about an inch and a half from Fuentes' throat, he pushed Upshaw and both combatants fell to the ground. When Cyr first entered the latrine, he felt that Fuentes was in danger and needed help. Since he had not been in the latrine at the beginning of the fight, he does not know who started it. However, at one point during the fight, Upshaw gained control of the situation, and Cyr felt that if he did not push them, Fuentes would have his throat cut. While Upshaw and Fuentes were on the floor, Fuentes finally gained control of the knife; thereupon Fuentes stabbed Upshaw several times in the back. Cyr had not tried to prevent Fuentes from stabbing Upshaw, because he was too frightened and stunned.

Cyr offered evidence of Upshaw's bad reputation for truthfulness and his own good reputation. Also, Major Gene Purvis, a psychiatrist, testified that he had seen Upshaw some ten times in Korea and had concluded that Upshaw had "a mixed personality disorder ... of an antisocial nature, passive-aggressive tendencies," and paranoia, as well as "explosive tendencies" which led to "violent outbursts."

In his final argument in the Cyr case, trial counsel contended that as to Charge I—the charge of aggravated assault with the mop handle—it made no difference whether the court members believed Cyr or Upshaw. In either instance, according to the prosecutor, Cyr had not acted lawfully for the defense of another, as he claimed. As to Charge II—the charge of assault with intent to murder—Captain Tyrrell contended that the evidence supporting Upshaw's version was "logical," "convincing," and "substantial," while Cyr's testimony was "improbable, contradictory, and ... fabricated."

After the arguments, Judge Hunter gave extensive instructions to the court members. Among other things, she discussed aiding and abetting, and explained that, dependent on his intent, an aider and abettor might be guilty of a different degree of the offense than his principal; she outlined the different lesser-included offenses; and she advised that Cyr was entitled to act in defense of Fuentes only if Fuentes was himself acting lawfully in self-defense. In response to a question from a court member, Judge Hunter instructed that defense of another—i.e., Fuentes—applied only to Charge I.

The court members deliberated a little more than two hours before returning findings as to Cyr. Then, after hearing evidence and argument on sentence, the court adjudged the sentence and adjourned at 4:35 p.m. on October 26. The next after-

noon proceedings resumed in the trial of Fuentes. However, because an appointed court member was absent, the court quickly recessed for the weekend and reconvened on the morning of October 30, when *voir dire* and challenges of the court members took place.

After Captain Tyrrell made an opening statement, defense counsel commenced his statement. At one point, defense counsel stated:

What the case is really going to come down to gentlemen, we expect is what Private Gary D. Upshaw says happened versus what Private First Class Fuentes says happened. Now in that regard, it's going to come down to who are you going to believe. Who's word is going to be given the greatest amount of weight?

We expect that the evidence will show that Private Gary D. Upshaw is a violent...

At this point, trial counsel asked for a sidebar conference, which he commenced by stating:

Sir, in response to the defense discovery demands, the government did indicate that Private Gary Upshaw would be a government witness. And based on that I can understand the defense counsel's argument, however at this time the government would contend that any argument concerning the background, the truth and veracity, any type of impeachment evidence going to Private Gary Upshaw where he has not testified, if he indeed does testify is not—Should not be allowed at this time but rather—If he testifies,-Obviously, then brought out in cross-examination and that's a very big if. *Because frankly, right now, the government does not intend to call Private Upshaw.*

(Emphasis supplied).

Judge Noble ruled:

Yes, this is an inappropriate place to attack a government witness if you want, under the circumstances should this happen, I will permit you to comment further before you present your case. But to attack the witness before

you know that he's coming on, and knowing that I think is improper. State your case, but let's not go into attacking the government's case.

Judge Noble also ruled that the defense opening statement could include Upshaw's history of violent acts, as long as the defense was prepared to prove those acts by its own evidence. Captain Pittman, the defense counsel, took full advantage of this opportunity.

Cyr was the principal witness for the Government. His testimony, as summarized later in the review of the staff judge advocate, was to this effect:

[O]n 25 July 1978, he was with the accused in the accused's room beginning right after work. They were drinking beer. Later that evening, he was looking for the accused, called out the accused's nickname, and was told to come here by the accused. Cyr went towards the latrine door, and saw the accused and PVT Upshaw fighting. Cyr watched, and grabbed a mop handle for his own protection. Cyr saw that the accused and Upshaw had the accused's knife in their hands. The knife started towards the accused's face and throat. Upshaw was behind the accused and had his arms around the accused. Cyr took a broom and poked Upshaw, trying to help Fuentes. Cyr pushed them by a wall locker and trash can. They both fell on the floor. Fuentes got up on one knee and pulled the knife away from Upshaw. Upshaw laid flat on his stomach. The accused stabbed Upshaw; the blade closed on the accused. The accused stabbed Upshaw a second time; the blade again closed on the accused. The accused stabbed Upshaw a third time; this time the blade stayed in Upshaw's back. Upshaw was jerking his arms and legs when the knife went down on him. Fifteen or twenty minutes later, the accused told Cyr he had done it because he had ripped him off. In Cyr's opinion, the accused was not drunk, but was real high on beer and alcohol. Cyr admitted that he himself had drunk about a six

pack of 12 ounce cans of Budweiser. While in the accused's room, Cyr saw that the accused had no cuts or bruises. When Cyr first went to the latrine, Upshaw seemed to Cyr to be able to maneuver the accused in the latrine; Fuentes looked scared and horrified; Fuentes had cuts and bruises on his face at this time. Cyr thought that Upshaw was about to cut the accused's throat and kill him. Upshaw seemed to be the one in control of the fight. When Fuentes stabbed Upshaw, he did not appear to be angry, but appeared to be frightened.

The other evidence offered by the Government was similar to that offered in the trial of Cyr—except that Upshaw did not testify.

Fuentes was the principal witness in his own defense. His version—again, as summarized in the staff judge advocate's review—was this:

[O]n the afternoon of 25 July 1978 he was in his room drinking. Prior to the 1630 hours formation he had drunk a little less than one-half of a fifth of Seagram's 7. After the formation, he drank about a six pack of Budweiser beer. Breakfast was the last meal he had that day. The accused went to go talk to Lee Williams about getting some money back. Williams was not in his room. The accused checked the dayroom, and there first saw Upshaw. After a brief, casual conversation, the accused left and returned to his room. After 15–20 minutes, [h]e went back to check on Lee Williams again. The accused left again, ran into Cyr, and told Cyr that he was going to get Williams. The accused went back once again to look for Williams, and went into the latrine to relieve himself. Upshaw came out of a stall and said "I hear you've been spreading rumors about how I stole your pistol." After a few brief words, Upshaw hit the accused in the face with his fist, grabbed the accused by the hair, pushed him up against the wall, and slammed the accused's head into the sink basin. At this point the accused pulled out his knife.

Upshaw grabbed the accused's wrist, got behind the accused, and started bringing the blade toward's the accused's face. They went into the wall lockers and hit the ground. The accused slid out from underneath and tried to pull the knife away. The accused does not recall how many times he stabbed Upshaw, but did see it go in once. Then everything was real fast—he ran out the door and then first saw Cyr. The accused thought Upshaw was trying to kill him. The accused stabbed Upshaw because he felt it was him or Upshaw; that Upshaw would do the same thing if the accused let him come back up. After he returned to his room, the accused wondered how bad Upshaw was hurt, and tried to call the emergency number. The accused had never been in any serious fights prior to this, and had never used a weapon like this before. The accused was just trying to keep Upshaw from coming at him. The accused never did make a decision as to whether he would or would not stab Upshaw, and did not intend to kill Upshaw.

The testimony of Dr. Purvis, which concerned Upshaw's personality and character-behavior disorder, corresponded to that which he gave in the trial of Cyr. Other witnesses testified that Fuentes was peaceful and did not start trouble.

At the conclusion of the evidence, the Government waived oral argument. In his argument, defense counsel pointed out that the opening statements were not evidence and that trial counsel had failed to prove the motive outlined in the opening statement. He also emphasized that Fuentes had testified that his meeting with Upshaw in the latrine was by chance and this testimony was unrefuted. Defense counsel then remarked that the Government was switching directions and relying on an argument that Fuentes had used excessive force. He then argued self-defense and, in this connection, relied not only on the testimony of Fuentes and Dr. Purvis, but also on that of "the government's own witness, Private Cyr." Indeed, at no point in his

closing argument did defense counsel take issue with any of Cyr's testimony.

Trial counsel's position in his closing argument was "that it will make absolutely no difference whether you totally disbelieve the accused, or whether you totally believe the accused under the set of facts as they have come forward from PFC Fuentes as he gave them to you on the stand." Thereafter, in an extensive argument, the prosecutor reviewed the evidence, including the testimony of Cyr. At one point in the argument, he sought to explain the Government's failure to call Upshaw in this manner:

The defense obviously has indicated throughout his unrebutted testimony,-obviously what the defense is getting to is the fact that the government may have not called Private Upshaw in this particular case. It's obvious from the testimony of Doctor Purvis that Private Upshaw has problems of some sort; perhaps psychological problems of some sort. But the point here is, gentlemen, you bring in Upshaw, and the case turns from *U.S. v. Fuentes*, to *U.S. v. Upshaw*. You get involved in many collateral issues. The fog comes out—the smoke screen comes out. What the defense does is he tries to muddle the water, he takes you away from the facts as they really occur on that particular night, and that's what happens when you bring in a victim that may be impeached.[6]

After the arguments, Judge Noble gave his instructions, including a discussion of lesser-included offenses, self-defense, the effect of intoxication, circumstantial evidence, and credibility of witnesses. After slightly more than an hour, the members returned their findings that Fuentes had assaulted Upshaw with intent to commit voluntary manslaughter.

## II

### A

■ In its opinion the Court of Military Review emphasized this concept:

A prosecutor's deliberate deception of a court by the presentation of known false evidence is incompatible with the rudimentary demands of justice and constitutes a corruption of the truth seeking process. *United States v. Agurs*, 427 U.S. 97, 103 [96 S.Ct. 2392, 2397, 49 L.Ed.2d 342] (1976); *Giglio v. United States*, 405 U.S. 150, 153 [92 S.Ct. 763, 765, 31 L.Ed.2d 104] (1972); *Mooney v. Holohan*, 294 U.S. 103, 112 [55 S.Ct. 340, 341, 79 L.Ed. 791] (1935); *Napue v. Illinois*, 360 U.S. 264, 269 [79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217] (1959). The applicability of this principle remains undiminished regardless of whether the Government solicits the false testimony or merely allows it to stand uncorrected when it appears.

We fully agree. *See, e.g., United States v. Brickey*, 16 M.J. 258 (C.M.A. 1983).

However, unlike the situation in the cases cited by the Court of Military Review, the prosecutor here had no personal knowledge that his witness was testifying falsely. He had not made any undisclosed promise of immunity or clemency to Cyr. *Cf. United States v. Webster*, 1 M.J. 216 (C.M.A. 1975). He was not aware of information unknown to the defense counsel which concerned Cyr's competency or credibility. *Cf. United States v. Brickey, supra.* Cyr had never personally disclosed to him any facts which were at odds with his sworn testimony. *Cf. United States v. Radford*, 14 M.J. 322 (C.M.A. 1982).

### B

Of course, Captain Tyrrell knew that Cyr had just been convicted of aiding and abetting Fuentes in the assault on Upshaw, and the Court of Military Review was critical that "[t]he trial counsel in calling Cyr failed to inform the court that Cyr was a convicted accomplice of appellant." 8 M.J. at 832. Sometimes a prosecutor may have an obligation to disclose to the defense counsel the criminal record of a government witness or even a victim. Indeed, in

---

**6.** A defense objection to this argument was over-     ruled by the judge.

*United States v. Agurs, supra,* the issue was whether such a duty existed under the particular circumstances there. However, there is no reason to believe that Cyr's record was unknown to Fuentes or his counsel. Probably Judge Noble, who tried Fuentes, also was quite aware of the outcome of Cyr's trial.

Perhaps the Court of Military Review meant that, in questioning Cyr or by stipulation, the prosecutor should have revealed to the court members that Cyr had just been convicted. However, it is unclear for what purpose this evidence would have been admissible. Certainly Cyr's conviction did not create any collateral estoppel to bind the Government in the case of Fuentes, for, where the parties are different, the findings in one trial are not binding in another. *Cf. United States v. Garcia,* 16 M.J. 52 (C.M.A. 1983). Moreover, a conviction of one person is not even admissible as evidence in the criminal trial of another person to prove the facts established by the conviction.[7]

Of course, a conviction is admissible to impeach the credibility of a witness. However, under the rules of evidence in effect at the time of this trial, a condition for such admissibility was that the conviction be final. *Compare* para. 153*b* (2)(b), Manual for Courts-Martial, United States, 1969 (Revised edition), and *United States v. Krewson,* 12 M.J. 157 (C.M.A. 1981), *with* Mil.R.Evid. 609(e). Clearly Cyr's conviction, which had occurred only a few days before, had not become final.

Moreover, to have informed the court members of Cyr's conviction might have prejudiced this appellant. For one thing, much of Cyr's testimony was very favorable to Fuentes' claim of self defense —indeed, so favorable that in closing argument Fuentes' defense counsel made no

effort to contradict Cyr or to impugn his credibility. Moreover, in view of the relationship between the facts of the two cases, if the court members in appellant's trial had learned that Cyr had been convicted, they probably would have assumed that the members of the first court-martial also were convinced that Fuentes, the principal, was guilty.

Finally, it seems clear that defense counsel for Fuentes made a tactical decision that to attack Cyr in any way would damage appellant's cause. Not only was Cyr left unscathed by the defense in closing argument, but also, as observed by the Court of Military Review, defense counsel's cross-examination allowed Cyr to specifically deny any criminal participation in the stabbing.[8] We can hardly designate as prosecutorial misconduct or prejudicial error trial counsel's failure to adduce evidence which, for tactical reasons, the defense did not wish presented. *United States v. Wray,* 9 M.J. 361 (C.M.A. 1980).

C

In his closing argument in Cyr's trial, the prosecutor had characterized Cyr's testimony as "improbable, contradictory, and ... fabricated." Moreover, according to the majority opinion of the Court of Military Review, "[t]he court-martial with members chose to believe Upshaw." 8 M.J. at 831. Under these circumstances the Court of Military Review criticized trial counsel because he "failed to advise the court that Cyr may testify, in part, falsely." *Id.* at 832 (footnote omitted). Moreover, that court complained because "[t]he nature of the questions asked Cyr on direct examination and his responses created an impression that Cyr was an innocent witness to the stabbing, a friend of appellant who tried unsuccessfully to break-up the fight

---

7. The conviction of Cyr only represented the opinion of the court members who returned the findings of guilty in a proceeding where Fuentes was not a party and had no opportunity to confront witnesses or present evidence.

8. Strangely, the Court of Military Review seems to criticize the defense counsel for this tactic. However, at the very least, the choice was a rational one and defense counsel was under no obligation to bring out by cross-examination of Cyr evidence that he considered harmful to Fuentes.

between appellant and the victim." *Id.* at 832–33 (footnote omitted).

■ We discern certain fallacies in this position. In the first place, it gives undue emphasis to the closing argument made by the prosecutor in Cyr's trial. The characterization of Cyr's testimony as "improbable, contradictory, and ... fabricated" did not purport to be based on any personal knowledge or belief of the trial counsel. Indeed, it is impermissible and unprofessional for a lawyer in closing argument to express his personal belief or opinion in the truth or falsity of any testimony or evidence. *United States v. Knickerbocker*, 2 M.J. 128 (C.M.A. 1977). As we construe Captain Tyrrell's argument, he was only contending that the factfinder should draw certain inferences as to accuracy and truthfulness of Cyr's testimony from the evidence that had been received. For a trial counsel to make such an argument is quite different from his having personal knowledge that a witness is lying.

Not infrequently, the Government prosecutes an alleged accomplice and, after his conviction, uses him as a witness against another defendant. Sometimes, just as here, the accomplice testifies in his own trial in a way inconsistent with his guilt and testifies in the same manner at the later trial. Nevertheless, the Government is not considered to have "engaged in foul play." *See United States v. Cervantes*, 542 F.2d 773, 777 (9th Cir. 1976). Pertinent is this passage from the opinion in *United States v. Hozian*, 622 F.2d 439, 442 (9th Cir. 1980):

> Finally, Hozian contends that it was improper to allow the government to present Gregg as a witness when it had sought to impeach him in his previous trial. We reject the argument. The testimony of a convicted co-defendant is admissible in a subsequent trial of an accomplice despite the fact that the co-defendant had asserted his own innocence in the prior proceedings. *United States v. Cervantes*, 542 F.2d 773 (9th Cir. 1976). Hozian's counsel had ample opportunity to impeach Gregg's credibility

on cross-examination and in closing argument, based on his previous conviction and the compelled nature of his testimony. Nothing more was required.

The Court of Military Review also erred by attaching undue significance to the findings of the court-martial which tried Cyr. It is an oversimplification to say that "[t]he court-martial with members chose to believe Upshaw." 8 M.J. at 831. Although sometimes it is clear from a court's findings that the members chose to believe or disbelieve a particular witness, *cf. United States v. Warren*, 13 M.J. 278 (C.M.A. 1982), we cannot say from the findings returned in Cyr's trial that the members believed all of Upshaw's testimony. As the Court of Military Review recognized, some of Upshaw's evidence was implausible. 8 M.J. at 831 n.4. Moreover, if the court members had accepted Upshaw's account at face value, they might have found Cyr guilty as charged—instead only of lesser-included offenses—and sentenced him more severely.

Furthermore, the findings did not necessarily signify that the court members believed that Cyr was lying in every particular. For example, Cyr testified that, when he entered the latrine, Fuentes and Upshaw were already fighting. Under Judge Hunter's instructions on defense of another, Cyr could be convicted on Charge I if Fuentes was at fault in starting the fight, even though Cyr believed that Fuentes was acting in self-defense. Thus, the court members could have convicted Cyr of that Charge even though they accepted his testimony as to why he used the mop handle against Upshaw.

There were only three eye-witnesses to the stabbing, and without the testimony of at least one of them, the Government could hardly prove its case against Fuentes beyond reasonable doubt. Of course, Fuentes himself could not be called by the prosecution, so only Upshaw and Cyr were available. Upshaw's credibility was weak and even his competence had been questioned. Therefore, trial counsel embarked on a very logical course of action—namely,

first to try Cyr, the suspected accomplice, and then to use him as a witness against Fuentes. This sequence of trials was known to Captain Pittman, the defense counsel for Fuentes. Indeed, he referred thereto in his September 22 request that Cyr be made available as a witness, and it was discussed on October 6 during an Article 39(a) session in the Fuentes case.

■ It was quite foreseeable that in his own trial Cyr might take the stand and claim to be innocent, and also it was foreseeable that the court members might disbelieve him. However, even if events took place in this manner, we do not see how this disqualified Cyr as a witness. No longer are convicted felons incompetent to testify, so persons convicted of crimes far more serious than the assaults of which Cyr was found guilty often are called as witnesses by the Government. Furthermore, when they are called to testify, the Government need not impeach their testimony by proving their prior convictions or by questioning them in a hostile manner. Such impeachment is, instead, the task of the defense.

■ Of course, if Cyr had testified quite differently at the trial of Fuentes than at his own trial, a different situation would exist. Certainly, the prosecutor then would have had a duty to be sure that defense counsel was aware of the probability that the witness had committed perjury on one occasion or the other. However, even then, impeachment by a prior inconsistent statement should be left to the defense—especially if the testimony at the current trial is favorable to the accused.[9]

In short, we disagree with the Court of Military Review that in some way trial counsel erred by questioning Cyr in a manner that allowed him to testify that he was a "horrified bystander." This testimony was consistent with Cyr's testimony at his own trial. It was consistent with the theory on which the Government chose to prosecute Fuentes—a theory which relied heavily on the physical evidence of four severe stab wounds in the victim's back. If this testimony was to be impeached or questioned in some way, Captain Tyrrell properly left the task to defense counsel. Of course, defense counsel had no occasion to impeach the witness because Cyr's version not only was consistent with the testimony of Fuentes, but also was favorable in many ways to his claim of self-defense. Indeed, defense counsel had requested a month before that Cyr be made available as a witness.

Of course, once Cyr's testimony was received in evidence, trial counsel was free to refer to it in argument. His situation in that regard was quite different from that of a counsel who has personal knowledge that a witness has lied and so should not rely on the testimony in argument. *Cf. United States v. Radford, supra.*

### D

■ The Court of Military Review also emphasized that trial counsel "did not call Upshaw, the victim, to testify even though he had informed appellant that Upshaw would be a witness." 8 M.J. at 831 (footnote omitted). Listing someone as a prospective witness for a party usually does not require that he be called to testify by that party. In any event, we find it hard to see why failure to call this witness was prejudicial to Fuentes, who—like Cyr—had taken the position in a lengthy pretrial hearing that Upshaw was not even competent to testify. When a witness is equally available to the defense, the Government is not required to call him. Indeed, if Captain Tyrrell had come to doubt Upshaw's account and believed it would be rejected by the court members, he acted wisely in not offering him as a witness.

### E

■ According to the Court of Military Review, trial counsel's opening statement

9. Under the Military Rules of Evidence, which have taken effect since appellant's trial, the prior statement of the witness can be considered not merely for impeachment but also as substantive evidence. *See* Mil.R.Evid. 801(d)(1).

implied that Upshaw would be called as a witness, offered background information pertinent to the incident, and offered a motive for a stabbing. Therefore, since the evidence did not conform to the opening statement, trial counsel acted improperly.

Of course, a lawyer should not allude in an opening statement or otherwise "to any matter that" would "not be supported by admissible evidence." Disciplinary Rule 7–106(C)(1), ABA Model, Code of Professional Responsibility. However, any transgression of this Rule by Captain Tyrrell was minor and presumably unintentional.

For example, the implication that Upshaw would be called as a witness is hard to find in the opening statement, if it is there at all. Moreover, during defense counsel's opening statement before any evidence had been presented, trial counsel stated, in response to inquiry, that the Government probably would not call Upshaw. At that point, defense counsel—if he was concerned about any contrary implication in the prosecutor's opening statement—could have requested that it be corrected, and we have no doubt that Judge Noble would have caused corrective action to be taken.

As to other matters mentioned in the opening statement which were not proven later, we cannot conclude from the record that trial counsel intended to go beyond the bounds of admissible evidence that he planned to introduce. In any event, defense counsel had available—and used—a remedy for trial counsel's failure to establish certain matters, such as motive, alluded to in the opening statement: In closing argument, defense counsel emphasized that trial counsel had failed to establish what he claimed in his opening statement he would prove.

### F

Unlike the Court of Military Review, we conclude there was no prosecutorial misconduct. Therefore, we have no occasion to consider the issue which divided that court—namely, whether the alleged misconduct required reversal of appellant's conviction.

### III

The decision of the United States Army Court of Military Review is affirmed.

Judge FLETCHER and Senior Judge COOK concur.